# Illinois Official Reports

## Appellate Court

---

**Greggs USA, Inc. v. 400 East Professional Associates, LP,**
**2021 IL App (1st) 200959**

---

| | |
|---|---|
| Appellate Court Caption | GREGGS USA, INC., Plaintiff and Counterdefendant-Appellant, v. 400 EAST PROFESSIONAL ASSOCIATES, LP, Defendant and Counterplaintiff-Appellee. |
| District & No. | First District, Third Division<br>No. 1-20-0959 |
| Filed<br>Rehearing denied | June 16, 2021<br>August 27, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2017-CH-04626; the Hon. Michael F. Otto, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Arthur E. Rosenson, of Rosenson & Zuckerman LLC, of Chicago, for appellant.<br><br>Cary G. Schiff and Christopher R. Johnson, of Gary G. Schiff & Associates, of Chicago, for appellee. |

Panel JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice Burke concurred in the judgment and opinion.

**OPINION**

¶ 1    Greggs USA, Inc. (Greggs), brought a single count amended complaint against its landlord, 400 East Professional Associates, LP (400 East), in which it alleged that breach of a commercial lease prevented Greggs from using the premises as it intended for a bakery and restaurant and caused Greggs to lose more than $100,000 in renovation expenses. 400 East counterclaimed, was granted summary judgment, and was awarded $154,613.82 in back rent, late fees, and attorney fees. Greggs seeks reversal of the summary judgment ruling, either because the record affirmatively shows the landlord's breach or because there was a material fact dispute that should have been construed in the nonmoving party's favor.

¶ 2    On June 24, 2020, the trial court granted the landlord's motion for summary judgment and ruled that the landlord was contractually entitled to $94,425.03 in unpaid rent and late fees and an amount of attorney fees to be determined from the landlord's petition filed within 21 days. On September 2, 2020, the court denied the tenant's motion for reconsideration and granted the landlord's petition for $60,188.79 in attorney fees. On September 10, 2020, the tenant filed its notice of appeal. We have jurisdiction over the tenant's timely appeal from a final judgment order based on Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017).

¶ 3    The parties executed a written lease for Unit A, 400 East Randolph Drive, Chicago, Illinois, which is a commercial premises of about 1375 square feet on the ground floor of a 40-story, high-rise condominium building. The space had previously been used as a coffee shop. In paragraph 3, Greggs agreed to "occupy and use the Premises space as a bakery and restaurant." In paragraph 2, Greggs agreed that "all Rent shall be paid to Landlord without offset or deduction, and the covenant to pay Rent shall be independent of every other covenant in this Lease." In addition, if rent was not timely paid, a 5% late charge and 12% interest would begin accruing after five days. Paragraph 2 also indicated Greggs's rent obligation would begin 150 days after Greggs took possession and then continue for the next 60 months. Monthly rent was $3781.25 during the first year and then increased annually until it was $4342.70 during the fifth and final year. Rent was, however, 100% abated for the first 4 months of the 60-month period and 50% abated for the subsequent 8 months, which effectively reduced the first year's monthly rent to $1890.63. The lease specified that Greggs took possession upon full lease execution, *i.e.*, Greggs took possession when it contracted with 400 East on June 21, 2016. Paragraph 4 addressed the condition of the property when Greggs took possession, stating:

> "4. *CONDITION OF PREMISES.* Tenant's taking possession of the Premises shall be conclusive evidence that the Premises were in good order and satisfactory condition when Tenant took possession. No agreement of Landlord to alter, remodel, decorate, clean or improve the Premises or the Building (or to provide Tenant with any credit or allowance for the same), and no representation regarding the condition of the Premises or the Building, have been made by or on behalf of Landlord or relied upon by Tenant,

- 2 -

except as stated herein or in a separate work letter, if any, executed by Landlord and Tenant."

The "Work Letter" attached as "Exhibit C" to the lease stated in relevant part:

"1. *DELIVERY.* Landlord shall deliver the Premises to Tenant in 'as is, where is' condition. Any desired construction and improvements to the Premises shall be performed by Tenant at its sole cost and expense.

* * *

30. *BLACK IRON.* The existing black iron shall be delivered to Tenant in good working order and in a clean condition. Tenant shall be responsible for maintaining the black iron and having it professionally cleaned at least once per year at its sole cost and expense."

Paragraph 25 of the lease, titled "MISCELLANEOUS," stated:

"B. Entire Agreement. This Lease, and the riders and exhibits, if any, attached hereto which are hereby made a part of this Lease, represent the complete agreement between Landlord and Tenant; and Landlord has made no representations or warranties except as expressly set forth in this Lease. No modification or amendment of or waiver under this Lease shall be binding upon Landlord or Tenant unless in writing signed by Landlord and Tenant."

¶ 4 After Greggs took possession in June 2016, it began renovating the commercial space. However, the board of directors of the condominium association for 400 East Randolph Drive ordered Greggs in September 2016 to stop its construction work immediately. During an inspection on September 27, 2016, the association's chief engineer had found unlicensed and uninsured contractors working at the premises. Greggs gave up possession on an unspecified date in 2017.

¶ 5 Greggs filed suit on March 30, 2017, based entirely on the statement in paragraph 30 of work letter: "The existing black iron shall be delivered to Tenant in good working order and in a clean condition." In a first amended complaint, Greggs alleged that "black iron" was a term for a ventilation system for smoke and cooking vapors and the return of fresh air, the ventilation system was essential for Greggs to use the leased property as a bakery and restaurant, and 400 East had breached its obligation to deliver the black iron in good working order as stated in paragraph 30. Greggs claimed that 400 East's breach of contract entitled Greggs to recoup its renovation expenditures, payments to 400 East, loss of income, and other funds, totaling in excess of $100,000. In its answer, 400 East denied the material allegations and alleged as affirmative defenses that (1) Greggs "had every opportunity to inspect the Premises [(including the ventilation system)] prior to Lease execution and delivery to determine the feasibility of make-up air calculations for Plaintiff's intended use," (2) Greggs had defaulted on the lease and owed in excess of $28,000 in rent and other charges specified in the lease, and (3) 400 East would have to expend "significant" funds to remedy Greggs's "improvements" to the property.

¶ 6 In its verified counterclaim, 400 East alleged that Greggs paid no rent after taking possession during June 2016, 400 East had mitigated its damages by reletting the unit effective July 2019 (with the assistance of a commercial real estate agent), and the gap between Greggs's abandonment in 2017 and the new tenant in 2019 was due to the poor quality or unfinished state of Greggs's renovations. 400 East further alleged that its new tenant operated a restaurant

but was unable to use any of Greggs's modifications and that all of the renovations had been removed. 400 East sought unpaid rent, unpaid electric costs, and late fees specified in the lease; the cost of removing the unusable renovation materials; court costs, attorney fees and expert witness fees as the "prevailing party" pursuant to the lease; and any other damages it incurred. Greggs denied the material allegations of 400 East's counterclaim and contended the landlord's breach had released Greggs from the lease.

¶ 7    During discovery, Greggs's expert witness, Olabode M. Beckley, was deposed by 400 East. Beckley was a licensed professional engineer and structural engineer. Beckley said "black iron" was a term that technicians used to describe the supply and exhaust system in relation to ventilation of a space. An engineer, however, would use the term "HVAC," meaning "heating, ventilation, and air conditioning," and also the more specific terms "supply duct," "exhaust duct," "supply fan," and "exhaust fan" when talking about "moving air around." In Beckley's opinion, 400 East breached paragraph 30 of the work letter by providing only the exhaust half of a supply-and-exhaust system. 400 East had refused Greggs's request to allow its contractor to create a hole in the building's 90-inch by 10-inch metal air duct in order to attach Greggs's air supply. Beckley acknowledged, however, that the air duct was solid and did not have a hole in it when the lease was signed.

¶ 8    400 East filed a motion for summary judgment in which it argued that paragraph 30, contrary to Greggs's assertions, only obligated 400 East regarding the existing black iron as of the date the parties executed the lease. Greggs's president and general contractor had inspected the premises before the lease was executed, then the president had contracted to take the premises " 'as is' " knowing that any desired construction and improvements would be undertaken solely at Greggs's expense. The contract language Greggs was relying upon did not obligate 400 East to make or allow any structural modifications to any components of its property.

¶ 9    In response to 400 East's motion, Greggs tendered an affidavit from its president and owner, Dedun Sonaike, and an affidavit from the project engineer, Beckley, indicating that they were assured by 400 East that there was an existing ventilation system which Greggs could access for its bakery and restaurant. Sonaike's sworn statement referred to conversations she had prior to executing the lease on June 21, 2016, and Beckley's affidavit referred to a conversation he had "[i]n the summer of 2016." Beckley also stated that the subsequent renovation work was performed in a good and workmanlike manner in conformance with the plans and specifications approved by 400 East and the City of Chicago and that the work passed the municipality's inspections. Beckley also said that when Greggs's renovations were nearly complete and it was time for the system he designed to be attached to the "ductwork above the ceiling," 400 East would not authorize this because it would "cause *** exhausted cooking fumes to contaminate the air in the building." In Beckley's opinion, however, the landlord's concern about exhaust fumes "was not true" and what he had intended to do was "standard practice in the design and construction of restaurant space." Sonaike's affidavit concluded that because 400 East "prevented [me] from opening for business, *** I did not *** pay *** any rent that would have otherwise been due under the Lease."

¶ 10    The trial judge was persuaded by 400 East's arguments for summary judgment. In addition to finding that Greggs could not sustain its claim for breach of contract regarding the black iron, the judge determined that Greggs admitted it had breached its obligation to pay rent. As we summarized above, the judge granted summary judgment and unpaid rent and fees to 400

East, denied Greggs's motion for reconsideration and granted 400 East's unopposed petition for attorney fees. This appeal followed.

¶ 11 Resolving a case by summary judgment is considered a drastic measure. *Seymour v. Collins*, 2015 IL 118432, ¶ 42, 39 N.E.3d 961. Therefore, summary judgment should be granted only when the moving party's right to judgment is clear and free from doubt. *Seymour*, 2015 IL 118432, ¶ 42. Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Seymour*, 2015 IL 118432, ¶ 42. When a reasonable person could draw divergent inferences from undisputed facts, summary judgment should be denied. *Seymour*, 2015 IL 118432, ¶ 42. On a motion for summary judgment, the trial judge must construe the record strictly against the movant and liberally in favor of the nonmovant. *Seymour*, 2015 IL 118432, ¶ 42. An appellate court addresses the entry of summary judgment *de novo*. *Seymour*, 2015 IL 118432, ¶ 42.

¶ 12 To recover for a breach of contract, the plaintiff must establish four elements: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff. *Zirp-Burnham, LLC v. E. Terrell Associates, Inc.*, 356 Ill. App. 3d 590, 600, 826 N.E.2d 430, 439 (2005). Although Greggs and 400 East agree there was a valid contract, they disagree whether Greggs established the other three elements of its claim.

¶ 13 Competent parties to a contract may agree to any terms they choose unless their agreement is prohibited by law or contrary to public policy. *J.B. Esker & Sons, Inc. v. Cle-Pa's Partnership*, 325 Ill. App. 3d 276, 284, 757 N.E.2d 1271, 1278 (2001). A court's goal in a contract dispute is to determine and give effect to the parties' intent when they contracted. *Shields Pork Plus, Inc. v. Swiss Valley Ag Service*, 329 Ill. App. 3d 305, 310, 767 N.E.2d 945, 949 (2002). If contract terms are unambiguous, the parties' intent is determined exclusively from their writing. *Shields Pork Plus*, 329 Ill. App. 3d at 310; *Owens v. McDermott, Will & Emery*, 316 Ill. App. 3d 340, 349, 736 N.E.2d 145, 154 (2000). Ambiguity exists when written terms have more than one meaning, but ambiguity is not created merely because the litigants disagree about the meaning of their written terms. *Clarendon America Insurance Co. v. Prime Group Realty Services, Inc.*, 389 Ill. App. 3d 724, 729, 907 N.E.2d 6, 12 (2009); *J.B. Esker*, 325 Ill. App. 3d at 285. Lease language that is definite and precise speaks for itself and needs no interpretation. *Clarendon America Insurance*, 389 Ill. App. 3d at 729; *J.B. Esker*, 325 Ill. App. 3d at 285. No court will rewrite a contract to provide a better bargain than the parties negotiated. *Owens*, 316 Ill. App. 3d at 349.

¶ 14 In response to 400 East's motion for summary judgment, Greggs argued there was a fact dispute warranting a trial. However, after summary judgment was granted, Greggs filed a motion for reconsideration in which it made the argument it now presents on appeal.

¶ 15 Greggs contends judgment for 400 East negated the landlord's contractual duty to deliver the black iron to the tenant in good working order as specified in paragraph 30. Greggs reads paragraph 30 along with paragraph 3's indication that Greggs "shall occupy and use the Premises as a bakery and restaurant." Greggs cites the Sonaike and Beckley affidavits as indicators that the "Landlord promised Greggs such access" to "the Building's ductwork." Also, the only plausible explanation for 400 East's commitment to provide the black iron in "good working order and clean condition" was to provide a ventilation system that was functional for the tenant's purposes, meaning a system that would be used for both the exhaust and intake airflow that a bakery and restaurant operation needs to operate its ovens. Greggs

- 5 -

then argues that the " 'as is' " language in the work letter can be disregarded because it concerned the condition of the leased premises, but the ductwork is located "above the ceiling" of the premises, which Greggs describes as part of the building's common areas. 400 East's refusal to allow a hole to be cut in its ductwork "prevented Greggs from opening its restaurant," and consequently, "Greggs refused to pay rent and filed suit." Greggs concludes that it is either undisputable that the landlord did not satisfy its contract with Greggs or, in the alternative, that there is ambiguity about the meaning of "black iron" or "delivered," which precluded the drastic measure of entering judgment on the pleadings.

¶ 16    We first address the premise that Greggs was justified in withholding rent. Even if we assume that 400 East breached a duty regarding the black iron, Greggs had agreed that "all Rent shall be paid to Landlord without offset or deduction, and the covenant to pay Rent shall be independent of every other covenant in this Lease." Lease language that is definite and precise speaks for itself and needs no interpretation. *Clarendon America Insurance*, 389 Ill. App. 3d at 729; *J.B. Esker*, 325 Ill. App. 3d at 285. Contract terms that are clear and unambiguous are enforced as written. *Owens*, 316 Ill. App. 3d at 349. Greggs's independent rent payment obligation is clearly stated and indisputable. Greggs was in possession for approximately a year. It was entitled to free or reduced rent during the initial months of its possession but has admitted to not paying rent that was subsequently due. In its answer to the landlord's counterclaim, Greggs contended "that it was released from its Lease obligations as a result of Landlord's material breach of the Lease." Greggs repeated this statement in response to 400 East's motion for summary judgment and specified that it had not paid rent. In her attached affidavit, Greggs's owner even swore that she refused to pay rent. There is no contract language or principle of contract construction that would have authorized Greggs to disregard its duty to pay monthly rent for the commercial space. Greggs's obligation was separate and independent of any concerns it had about the black iron. Not only was this requirement specified in the contract, but there is also a general principle that a commercial tenant's obligation to pay rent is independent of a landlord's obligations regarding the premises. See *Zion Industries, Inc. v. Loy*, 46 Ill. App. 3d 902, 906, 361 N.E.2d 605, 608 (1977) (commercial lease case stating the general rule that a landlord's covenant regarding the condition of the premises is separate and independent of a tenant's covenant to pay rent and that a landlord's failure to make promised repairs does not discharge the tenant's duty). When a landlord's breach of a covenant can be compensated in damages, that covenant is independent of and not a condition precedent to the tenant's rent payment, and the tenant must perform its own covenants and then may rely on a claim for damages. *City of Chicago v. American National Bank*, 86 Ill. App. 3d 960, 963, 408 N.E.2d 379, 381 (1980) (if commercial landlord agrees to repair, its covenant is independent of the tenant's duty to pay rent, thus, tenant's "eventual abandonment of their store did not cure their failure to pay rent"); *McArdle v. Courson*, 82 Ill. App. 3d 123, 126, 402 N.E.2d 292, 295 (1980) (an Illinois commercial tenant may not both remain in possession and refuse to pay rent when a landlord breaches a covenant of the lease; tenant's withholding of rent was in breach of lease); *Palmer v. Meriden Britannia Co.*, 188 Ill. 508, 522, 59 N.E. 247, 252 (1900) (where one party has substantially but imperfectly performed and the other party has accepted the benefit, the recipient must perform his part of the agreement but may seek damages for the other's breach). Because Greggs admitted it was in breach of contract, it could never establish the second element of its breach of contract action, which was performance of the contract by the plaintiff. See *Zirp-Burnham*, 356 Ill.

App. 3d at 600. Greggs's failure to pay rent not only defeated its breach of contract action, but also conceded much of 400 East's counterclaim for unpaid rent and late fees, as well as attorney fees as the prevailing litigant.

¶ 17　　Furthermore, we are not persuaded that 400 East breached the contract. Paragraph 30 stated, "The *existing* black iron shall be delivered to tenant in good working order and in a clean condition. Tenant shall be responsible for maintaining the black iron and having it professionally cleaned at least once per year at its sole cost and expense." (Emphasis added). As described by Greggs's expert, engineer Beckley, Greggs's specific contention was that 400 East breached only by refusing to allow Greggs to cut a hole in the building's existing 90-inch by 10-inch metal air duct during the renovations. Beckley wanted to connect Greggs's new fan and duct to the existing duct in order to obtain "make-up" or "supply" air for the ventilation system that he had designed. Beckley acknowledged there was no such hole in the metal before Greggs began its renovation work. The contract indicated 400 East was obligated only to deliver the black iron that existed and was not required to deliver it in any modified form or allow it to be modified for Greggs's particular use or purpose. Thus, because 400 East did not have a contractual duty to perform or allow Greggs to perform structural modifications to any component of the black iron, there was no genuine issue of material fact as to whether 400 East breached paragraph 30. The trial judge's ruling accurately applied the terms of paragraph 30.

¶ 18　　The trial judge correctly declined to adopt Greggs's alternative construction based on the statement in paragraph 3 that Greggs agreed to "occupy and use the Premises space as a bakery and restaurant." Greggs contends this phrase required or permitted modification to the existing duct work so that Greggs could operate the business contemplated in the lease. However, lease language that is definite and precise speaks for itself and needs no interpretation. *Clarendon America Insurance*, 389 Ill. App. 3d at 729; *J.B. Esker*, 325 Ill. App. 3d at 285. Greggs must cite specific contract language making it 400 East's duty to ensure that the commercial property contained the qualities or fixtures necessary for Greggs's business to function as a bakery and restaurant. "[T]he doctrine of *caveat emptor* is generally applicable to lease agreements." *A.O. Smith Corp. v. Kaufman Grain Co.*, 231 Ill. App. 3d 390, 395, 596 N.E.2d 1156, 1160 (1992). Even in a commercial lease of premises that will be used for a specific purpose, there is no implied covenant that the premises are fit for that purpose. *A.O. Smith Corp.*, 231 Ill. App. 3d at 395. Although Illinois common law recognizes an implied warranty of habitability in real estate transactions, the duty extends only to residential property. See *Jack Spring, Inc. v. Little*, 50 Ill. 2d 351, 365, 280 N.E.2d 208, 217 (1972). The comparable provision of an implied warranty of fitness for a particular purpose is applicable only to the sale of goods. See *Board of Managers of Park Point at Wheeling Condominium Ass'n v. Park Point at Wheeling, LLC*, 2015 IL App (1st) 123452, ¶ 18, 48 N.E.3d 1250 (implied warranty of habitability of new construction is generally imposed against only builders or builder-sellers, not engineers and architects (citing *Kemper Architects, P.C. v. McFall, Konkel & Kimball Consulting Engineers, Inc.*, 843 P.2d 1178, 1186 (Wyo. 1992) (implied warranty of fitness for a particular purpose is applicable only to the sale of goods, not professional services, and engineer did not impliedly agree to provide architect with " 'useful' " and " 'workable' " HVAC system for its new building))).

¶ 19　　If Greggs and 400 East agreed to an affirmative contractual duty regarding the suitability of the black iron for the tenant's purposes, there would be specific language to that effect. The trial judge cited *Sweeting v. Reining*, 235 Ill. App. 572 (1924), for this proposition in the

judgment order, and Greggs addressed *Sweeting*, a 1924 opinion, in its motion for reconsideration of the order and in its appellate briefs. That particular case has some factual parallels, but it is nonbinding Illinois authority because it is an intermediate appellate court decision filed before 1935. *Reichert v. Court of Claims of Illinois*, 203 Ill. 2d 257, 262 n.1, 786 N.E.2d 174, 178 (2003) (Illinois appellate court opinions prior to 1935 are not binding but can be persuasive authority); *Basham v. Hunt*, 332 Ill. App. 3d 980, 992 n.3, 773 N.E.2d 1213, 1224 (2002) (same). Accordingly, we decline to discuss its details. But we note that *Sweeting* is now nearly 100 years old and is a persuasive indication that Illinois has long recognized Greggs's burden to cite specific contract terms in which 400 East ensured that its commercial property would contain qualities or fixtures that Greggs needed for its bakery and restaurant enterprise. Since *Sweeting*, there have been binding Illinois decisions such as *Lipschultz v. So-Jess Management Corp.*, 89 Ill. App. 2d 192, 195, 203, 232 N.E.2d 485, 491 (1967), which concerned a commercial property landlord who expressly agreed to " 'level and install asphalt tile floors of a color to be selected by Lessee' " and " 'install the necessary duct work and a package heating and air conditioning unit with thermostatic control on the premises of the Lessee.' " The tenant's allegations that the landlord breached these affirmative duties by installing a defective floor and an inadequate ventilating system warranted a trial. *Lipschultz*, 89 Ill. App. 2d at 195-96. On the other hand, the commercial lease at issue in *Intaglio Service Corp. v. J.L. Williams & Co.*, 95 Ill. App. 3d 708, 710-11, 420 N.E.2d 634, 636 (1981), lacked specificity, stating:

> "Prior to the commencement of the term of this lease, Lessor shall erect and complete, at Lessor's expense, a one-story office and brick manufacturing building containing approximately 60,000 square feet, including approximately 52,000 square feet of air conditioned space. All work will be done in accordance with plans and specifications prepared by Thomas A. Rambert, Architect, and approved and initialed by Lessor and Lessee."

These terms did not "disclose a duty on the [landlord] to design the buildings" or even "indicat[e] whose agent the architect was." *Intaglio Service*, 95 Ill. App. 3d at 712. Similarly, here, Greggs cannot cite contract terms that the landlord failed to satisfy when, pursuant to paragraph 30, the "existing black iron [was] delivered to Tenant in good working order and in a clean condition" in June 2016 and "Tenant [became] responsible for maintaining the black iron and having it professionally cleaned at least once per year at its sole cost and expense."

¶ 20    Paragraph 30 is plainly about the existing system's operational and clean state during Greggs's tenancy. It is not a commitment by 400 East to provide a ventilation system that is functional for Greggs's specific purposes. Reading paragraph 30 with paragraph 3's statement about using the space for a bakery and restaurant does not change either party's rights or obligations regarding the black iron. Furthermore, paragraph 4 also addresses the proper operating order and clean condition of the premises. The first of the two sentences in paragraph 4 specifies that "taking possession *** shall be conclusive evidence that the Premises were in good order and satisfactory condition when Tenant took possession." The next sentence in paragraph 4 indicates 400 East will not change the state of the property, unless those changes are agreed upon in a separate, executed work letter:

> "No agreement of Landlord to alter, remodel, decorate, clean or improve the Premises or the Building ***, and no representation regarding the condition of the Premises or the Building, have been made by or on behalf of Landlord or relied upon by Tenant,

except as stated herein or in a separate work letter, if any, executed by Landlord and Tenant."

Paragraphs 30, 3, and 4 are harmonious and clearly worded. There is no language in paragraphs 30 and 3 that supports Greggs's breach of duty argument, and the language in paragraph 4 affirmatively refutes any suggestion that the landlord committed "to alter, remodel, decorate, clean or improve the [black iron]" for Greggs's benefit. Paragraph 4 also affirmatively states that "no representation regarding the condition of the Premises or the Building[ ] have been made by or on behalf of Landlord or relied upon by Tenant," unless spelled out in the separate work letter. The work letter definitively states, however, that 400 East was to deliver what existed, it was not to improve what existed. Courts give effect to contracts; they do not change their terms. *Fox v. Commercial Coin Laundry Systems*, 325 Ill. App. 3d 473, 475, 757 N.E.2d 529, 531 (2001).

¶ 21 Greggs's argument is based in part on Sonaike's and Beckley's affidavits. In his ruling on 400 East's motion for summary judgment, the trial judge found that statements Greggs attributed to 400 East did not form part of the parties' contract. This was sound, given that a written contract is presumed to include all material terms agreed upon by the parties, and any prior negotiations or representations are merged into that agreement. *Asset Recovery Contracting, LLC v. Walsh Construction Co. of Illinois*, 2012 IL App (1st) 101226, ¶¶ 58, 67, 980 N.E.2d 708 (under the four corners rule, conversations prior to the written agreement merge into the written document and a court will not consider extrinsic evidence " 'for the purpose of changing the contract or showing an intention or understanding different from that expressed in the written agreement' "); *Village of Palatine v. Palatine Associates, LLC*, 2012 IL App (1st) 102707, ¶ 45, 966 N.E.2d 1174. Therefore, extrinsic evidence of antecedent understandings and negotiations is inadmissible to alter, vary, or contradict an unambiguous written contract. *Asset Recovery*, 2012 IL App (1st) 101226, ¶ 67. Greggs points out that courts make an exception to this rule when an ambiguity exists within the contract's four corners, that is, when the written agreement is unclear and the court must look elsewhere for the proper interpretation. *Cox v. US Fitness, LLC*, 2013 IL App (1st) 122442, ¶ 13, 2 N.E.3d 1211. We reiterate that "[i]f a court can ascertain its meaning from the plain language of the contract, there is no ambiguity." *J.B. Esker*, 325 Ill. App. 3d at 285. Since there is no ambiguity in the lease at issue, the exception is not applicable.

¶ 22 Furthermore, when parties include an integration clause in their contract, they are manifesting their intention to protect themselves against misinterpretations that might arise from consideration of the extrinsic evidence. *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 464, 706 N.E.2d 882, 885 (1999).

"During contract negotiations, a party may propose terms, conditions, and provisions which are ultimately rejected in order to reach a compromise with the other party. That other party, of course, may do the same. The integration clause makes clear that the negotiations leading to the written contract *are not* the agreement. Accordingly, considering extrinsic evidence of prior negotiations to create an 'extrinsic ambiguity' where *both* parties *explicitly* agree that such evidence will *not* be considered ignores the express intentions of the parties and renders integration clauses null." (Emphases in original.) *Air Safety*, 185 Ill. 2d at 464-65.

¶ 23 Paragraph 25 is an integration clause that states that the lease and attached documents (which include the work letter) "represent the complete agreement between Landlord and

Tenant." The trial judge correctly determined that the contract manifested the parties' intention to protect themselves against any misinterpretations and declined to consider any extrinsic evidence offered by Greggs regarding paragraph 30.

¶ 24 However, even if we considered these affidavits, neither Sonaike nor Beckley indicated the lease was supposed to provide that one or both of the parties would alter the black iron. The affidavits did not create a question of material fact about Greggs's breach of contract action.

¶ 25 In addition, paragraph 1 of the work letter specified the " 'as is, where is' " state of the property at the time Greggs accepted possession. An "as is" clause does not exculpate a contracting party from all possible conduct. See, *e.g.*, *Bauer v. Giannis*, 359 Ill. App. 3d 897, 906, 834 N.E.2d 952, 960 (2005) (an "as is" provision does not allow a property seller to contract out of its statutory obligation to disclose certain defects). Nevertheless, this lease does not include express words or an implied standard indicating that the premises are suitable or will be made sufficient for Greggs's purposes, and the addition of "as is" language is consistent with paragraphs 30, 3, and 4. Layered along with all of the contract language we have discussed is the unequivocal statement that follows the "as is" clause: "Any desired construction and improvements to the Premises shall be performed by Tenant at its sole cost and expense."

¶ 26 Greggs's alternative argument of ambiguity in the terms "delivered" and "black iron" rely on the two affidavits concerning the precontract conversations. The four corners rule and the integration clause preclude our consideration of Sonaike and Beckley's statements about their interpretation of the clear and unambiguous written contract. And, again, in any event, neither affiant indicated a hole would be cut in the black iron, and thus, neither affidavit created a question of material fact. Therefore, we are unpersuaded that there were unanswered questions in the trial court about the meaning of "delivered" and "black iron" that should have prevented the entry of summary judgment.

¶ 27 Greggs's suit failed because Greggs did not perform its covenant to pay rent and Greggs could not sustain its allegation that 400 East breached its covenant to deliver the black iron in good working order. 400 East was entitled to judgment as a matter of law on Greggs's claim.

¶ 28 400 East's verified counterclaim concerned unpaid rent. As we summarized at the outset, Greggs was initially entitled to free or reduced rent. Greggs's answer admitted its failure to pay rent for "Months 8-12 of Year 1" and "all Base Rent during Year 2" of the lease. Greggs's response in opposition to the motion for summary judgment indicated Greggs refused to pay rent. 400 East was entitled to judgment as a matter of law on its counterclaim.

¶ 29 For these reasons, the trial judge's entry of summary judgment in favor of 400 East and against Greggs as to the claim and counterclaim is affirmed.

¶ 30 On appeal, Greggs does not specifically challenge the denial of its motion for reconsideration, dispute 400 East's contractual right to "reasonable attorney fees and costs" as the "prevailing party in any litigation to enforce this Lease," or seek review of the amount of attorney fees and costs granted to 400 East. Accordingly, our review is limited to the summary judgment ruling that we have affirmed.

¶ 31 Affirmed.