2025 IL App (1st) 240421-U

SECOND DIVISION
June 3, 2025

No. 1-24-0421

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| WALLACE BRADLEY, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellant, | ) | of Cook County |
| | ) | |
| v. | ) | 22M1120361 |
| | ) | |
| ALEXI GIANNOULIAS and HANAH JUBEH, | ) | Honorable |
| | ) | Maire Aileen Dempsey, |
| Defendants-Appellees. | ) | Judge Presiding |

JUSTICE McBRIDE delivered the judgment of the court.
Justices Mikva and Mitchell concurred in the judgment.

**O R D E R**

¶ 1    *Held*: Summary judgment against breach of contract and *quantum meruit* claims affirmed where appellant failed to raise a question of material fact, given that he was the only party to sign the purported contract and conceded that he did not perform its stated duties.

¶ 2    Wallace Bradley appeals from the entry of summary judgment against a breach of contract or *quantum meruit* suit that he filed against Alexi Giannoulias, the Illinois Secretary of State, and Hanah Jubeh, who managed Giannoulias' successful political campaign in 2022. It is undisputed that Bradley was retained and paid in full by the Citizens for Giannoulias campaign committee for work as a consultant during 2022's primary election period. The disagreement is about whether Bradley was also hired for the general election period that followed. During the summary judgment

hearing, Bradley admitted that after the primary, he did not perform any of the services outlined in his purported contract. He sought reconsideration on grounds that he was excused from performing because the campaign was not paying him and had triggered the first-to-breach rule. The motion was denied, but Bradley renews the argument in this appeal. He does not argue for reinstatement of his *quantum meruit* count.

¶ 3    Bradley alleged as follows in his amended complaint. During the primary election cycle of 2022, the campaign considered Bradley's proposed "Amended Contract" on April 12th, negotiated some of the terms, and retained Bradley as a political consultant. Jubeh was supposed to sign the document, but she never signed it. The document provides he will be paid $4,000 in April, $3,000 in May, and $3,000 in June; and, if the candidate wins the primary election on June 28th, then Bradley will continue to work until the general election on November 8th, in exchange for $5,000 payments in July, August, September, October and November. Giannoulias won the Democratic primary. "[C]onsistent" with the written terms, Bradley worked diligently between April 12th and November 8th. However, the campaign's conduct was "consistent" with the contract only during the primary election period, when it timely paid a total of $10,000, and it subsequently breached the general election portion of the agreement. Bradley asked for $25,000, based on breach of contract (Count I) or *quantum meruit* (Count II).

¶ 4    In their answer, the defendants' only admission was that the campaign committee paid Bradley a total of $10,000. All other allegations were denied.

¶ 5    The parties were allowed two weeks for limited written discovery, during which the defendants issued a request to admit facts. Bradley admitted that he met with the defendants to discuss his proposed contract, the defendants rejected his terms, and he agreed to revise them.

Bradley denied being told that his initial involvement with the campaign would be limited to the primary election campaign and that his subsequent involvement would be considered after the primary. He admitted that "a campaign professional's work and messaging" are "dictated" by the candidate, campaign manager, and senior campaign staff, and that he did not participate in any staff meetings during the general election campaign. The defendants also sent Bradley interrogatories, eliciting the names of individuals who had knowledge of the underlying facts, which we will detail below.

¶ 6 The defendants sought summary judgment and attached their request to admit facts and Bradley's response as Exhibits N and O. The motion centered on the undisputed in-person renegotiation of Bradley's written proposal. They argued there was no contract, neither written nor oral, that included the general election campaign and that Bradley provided no services during that time span.

¶ 7 Exhibit E was campaign manager Jubeh's affidavit in which she swore to the following. Bradley e-mailed her a "Professional Services Agreement" in March 2022 proposing to work as a campaign consultant for $5,000 per month until the June primary, and further proposing that if Giannoulias won the primary, then the contract's end date would be extended to the general election in November. On April 12th, she and campaign strategist Rudi Patitucci met with Bradley. During the meeting (1) Jubeh told Bradley that his proposal was not acceptable; (2) Jubeh and Patitucci told Bradley that his engagement could not automatically extend beyond the primary election in June and that $5,000 per month was not reasonable compensation; (3) at the time, the campaign was solely focused on the primary election, no one had contemplated strategy and resource allocation for the general election period, and the campaign could not make any

commitments beyond the primary election; (4) Bradley acknowledged and accepted this; and (4) Jubeh and Bradley agreed that the campaign committee would engage him only for the primary election and would pay him a $4,000 retainer in April and $3,000 in both May and June. Bradley did not, however, revise his proposal or otherwise put the agreed-upon terms into writing.

¶ 8    Jubeh further swore that Bradley e-mailed her during April and May with ideas about the primary campaign, such as to advertise in certain Chicago media outlets, that he schedule interviews with local outlets, and that he speak about certain topics on an evening show that he hosted. His e-mails to Jubeh were marked as Exhibit G to the motion for summary judgment. Jubeh's affidavit also indicated that none of Bradley's suggestions fit the campaign's strategy and budget and that none of his ideas were adopted. Regardless, Bradley was compensated $10,000 in accordance with the parties' verbal agreement. Exhibit M consisted of photocopies of the campaign committee's three checks to Bradley. We note that the checks' dates and amounts substantiate Jubeh's affidavit and that the phrase "Final Payment" appears on the memo line of the $3,000 check that Bradley received and cashed in June.

¶ 9    Jubeh also swore that after the primary, the campaign committee determined that Bradley's services would not be needed during the general election period and that she told Bradley this. Bradley reached out to her again, she did not accept his offer to work, he provided no services during the general election, he was not privy to any general election strategy, and he was not present during any official campaign events or outreach programs. Bradley's response to the defendants' request to admit facts includes his acknowledgements that any campaign work would have been "dictated" to him and yet he did not participate in any campaign staff meetings during the general election cycle.

¶ 10     Jubeh further stated that on August 3rd, about four months after the parties verbally contracted on April 12th and about a month after the primary election on June 28th, she received an e-mail from Bradley with a revised version of his written "Personal Services Agreement." He had signed and handwritten the date of April 12th. This document was marked as Exhibit J to the motion for summary judgment. From this court's perspective, it differs from Bradley's initial proposal only with respect to the April through June compensation. According to Jubeh, the August proposal included terms that were never agreed upon, such as that Bradley's services extended during the general election period and that he be paid $5,000 per month for July to November. Jubeh also swore that this was the first time this particular combination of terms was submitted to any campaign representative. The terms of Bradley's August proposal were contrary to the campaign's fee structure and the consultant retention policy that had been discussed during the April meeting. The August terms were unacceptable.

¶ 11     Exhibit F was campaign strategist Patitucci's affidavit. He corroborated Jubeh's statement, specifying that he was present during the April 12th meeting when Jubeh rejected Bradley's initial proposal, rejected the $5,000 per month as excessive, and rejected that Bradley's engagement would continue between the primary and general elections. Patitucci also stated that Jubeh told Bradley that the general election campaign strategy and the need for consultants during that period would not be determined until after the primary campaign had been won. Bradley had agreed that his involvement with the campaign would terminate at the end of June and that his reengagement for the general election campaign would subsequently be determined. Other than "a few in person exchanges" when Bradley came to pick up his checks, Patitucci and Bradley did not interact, and they had no contact whatsoever after Bradley picked up his June check.

¶ 12    Exhibit H was Bradley's e-mail to Jubeh on July 12th, *i.e.*, after the June 28th primary and after Jubeh purportedly told Bradley that the campaign committee was not rehiring him. The e-mail's subject line was "This Story is interesting and informative" and included a link to a Chicago Tribune article discussing disputes between political campaigns and vendors. In his e-mail, Bradley quoted the reporter's remark that such pay disputes are " 'often handled privately' " to mitigate reputational damage to candidates. Exhibit H shows that Jubeh forwarded the e-mail to someone. Although the recipient's information was redacted, the motion for summary judgment stated that Jubeh forwarded the e-mail to the campaign's attorney. There is no indication that Jubeh responded to Bradley.

¶ 13    Exhibit I was an e-mail that Bradley sent to Jubeh, J.B. Pritzker's campaign for Illinois Governor, and others on August 12th. The defendants describe this as a solicitation for work. Bradley wrote in part, "I'm saying this to let you know that Governor JB and Alexi Giannoulias need [Bradley] more than they could ever imagine." There is no indication that Jubeh responded to the e-mail.

¶ 14    The motion for summary judgment contrasted Bradley's pre-primary election communication when he was brainstorming campaign strategy such as where to advertise and his post-primary communication when he was threatening litigation and soliciting work.

¶ 15    Exhibit J was the revised "Professional Services Agreement" or "August Proposal" that Jubeh swore she first received on August 3rd and which included terms to employ Bradley during the general election season and which had purportedly been rejected during the April 12th meeting.

¶ 16    Exhibits K and L were letters that were exchanged between Bradley's attorney and the campaign's attorney in mid-September. Bradley's attorney refers to the partially executed proposal

as a fully executed contract which is the basis for Bradley's demand for $15,000 and states, "This is not a matter that should be litigated." The campaign's attorney wrote back, agreeing that the matter should not be litigated, because Bradley knew there was no agreement covering the general election period. The parties did not communicate any further before Bradley filed suit in October, about a month before the general election.

¶ 17    The defendants moved for summary judgment on Count I, the breach of contract claim, arguing that there was never a contract covering the general election campaign. If the court determined there was a contract, then the defendants asserted the affirmative defense of Bradley's nonperformance, because during discovery he did not provide any evidence of rendering any service. He had only alluded to his public access show in which he occasionally referred to candidates in various races regardless of whether he had been retained by them; and also seemed to attribute Giannoulias' ultimate success to help that Bradley provided before the primary. The defendants also cited Bradley's lack of any service as grounds for summary judgment on the equitable claim set out as Count II. Unlike other consultants and vendors whose services extended beyond the primary election, Bradley did not engage in strategy meetings or calls about the general election. The best he seemed to muster were references that he made to Giannoulias during the public access show, but these statements "were not only unsolicited *** they also did not align with the campaign and were not even always complimentary of Giannoulias."

¶ 18    In response, Bradley characterized the motion for summary judgment as a *Celotex*-type motion that, after discovery, relied on the plaintiff being unable to prove a crucial element of the case. He argued that the three checks he received before the primary were consistent with the purported contract through the general election and that the discovery necessary to prove his case

had only just begun. He wanted to depose people he identified during discovery. People who could testify about the underlying facts and "were aware that [he] was working on the General Election campaign," included his spouse and "Gov. JB Pritzker, former Secretary of State Jesse White, U.S. Senator Dick Durbin, U.S. Senator Tammy Duckworth, Cook County Board President Toni Preckwinkle, Cook County Clerk Karen Yarborough and Rev. Leslie Sanders." People who could testify about the "agreements" included his spouse; Torrence Smith, the videographer who assisted Bradley with his public access show; Dr. Cornel Darden, Jr., who was aware of "potential advertising sought for the Defendants in both the Primary and General Elections;" and Erica Chiang, who could testify about "Press Releases issued in regards to services provided during the General Election." We cannot summarize Bradley's full response to the motion for summary judgment, however, because the only copy in the record on appeal is an obviously incomplete one that trails off without an argument about the last attached exhibit, and without a concluding statement and the attorney signature that is mandated by Illinois Supreme Court Rule 137. Ill. S. Ct. R. 137(b) (eff. Aug. 1, 1989) (requiring every document to be signed by an attorney of record or the *pro se* party). Its record citation is C 269 through C 273. Bradley cites the same truncated document in his appellate brief, stating "Plaintiff filed a Response to the Motion for Summary Judgment (C 269 – C 273)." The last attached exhibit is Bradley's affidavit, in which he states only: "to the best of my knowledge, all of the facts contained in my AMENDED COMPLAINT and in my RESPONSE TO DEFENDANT'S [(*sic*)] MOTION FOR SUMMARY JUDGMENT are truthful, accurate and complete."

¶ 19    The subsequent order on appeal provides:

"This matter before the court for hearing on defendants' motion for summary judg-

ment, plaintiff present via Zoom and by counsel and defendants by counsel present in court:

> 1. Defendants' motion for summary judgment granted in its entirety for the reasons stated in open court."

¶ 20 The record lacks a transcript of the hearing. Bradley did not summarize it in his appellate brief, but he did not dispute the description that the defendants included in their appellate brief:

> "On January 8, 2024, the Circuit Court first addressed whether Plaintiff provided any services during the General Election Campaign, as raised by Defendants in their motion. After reviewing Plaintiff's discovery responses, Defendants' affidavits, and attached Exhibits, the Circuit Court repeatedly—over a dozen times—asked Plaintiff to specify the services he allegedly provided. *See* C-118-C267. [Record citation to the exhibits attached to the motion for summary judgment.] In each instance, Plaintiff could not provide details about the services he provided, when they were rendered, or who had requested them. The Circuit Court then examined the alleged unsigned agreement, particularly the section outlining the scope of services Plaintiff was supposed to provide during the General Election Campaign. The Circuit Court read this section aloud to both parties and asked whether Plaintiff had performed the services outlined in his proposal. The Plaintiff admitted that he had not performed under the terms of his alleged agreement."

¶ 21 Bradley filed a motion for reconsideration. At the hearing, the court asked Bradley to clarify whether he was claiming the agreement was oral or written:

> "THE COURT: We have a court reporter here, and I want to make sure it's clear on the record.

Are you alleging an oral contract or a written contract?

MR. ZINGER: I'm alleging that a written contract was presented to Hanah. She promised to sign it and did not sign it.

THE COURT: Okay. That part I understand.

Are you saying that it's a written contract or an oral contract?

MR. ZINGER: Well, I'm saying that it's a written contract, but it was not signed by Hanah, so it become [(*sic*)] an oral contract. But the provisions in the contract are in writing, and they were performed on by the parties.

THE COURT: Okay. Fair enough. Go ahead.

MR. ZINGER: In April, May, June through the primary, all of this was performed. It's not like this was some sort of fantasy in Mr. Bradley's mind. That is what we have alleged. So there certainly was a contract, whether you want to call it oral or written.

THE COURT: No. I think that distinction is significant. That's why I want to be very clear on the record what you're alleging.

Are you saying there's an oral contract, or are you saying there's a written contract? Because there is a legal difference, and it is significant. That's why I want it to be clear on the record.

MR. ZINGER: I'm saying that there is a written contract that was not returned as promised by one of the defendants.

THE COURT: So your theory is a written contract. You're not going forward on an oral contract theory; is that correct?

MR. ZINGER: That is correct."

¶ 22 The court indicated that Bradley had not created an issue of breach of a written contract because a contract signed by only one side is not enforceable. Also, regardless of whether Bradley wanted to proceed under breach of a written or an oral contract, a necessary element of the claim is the plaintiff's performance, and Bradley had nothing more than his own conclusory and self-serving statements to that effect:

> "[THE COURT:] But when we were at the initial hearing, we went through this over and over and over again. I said, [']What is the evidence that he did any of these things between the time of the primary and the time of the general election[']? And I was told repeatedly there is none.
>
> As I stated earlier, to proceed on a contract [action], whether oral or written, you need to have some affirmative evidence[.] ***
>
> So without that evidence, the Court's finding is that, as a matter of law, the plaintiff can't proceed because he doesn't have evidence that he performed under the contract. I don't see it.
>
> So that's the basis of my ruling, and I'm not going to change it."

¶ 23 The court indicated it was not addressing the *quantum meruit* count because Bradley had not addressed that count in his motion to reconsider. This appeal followed.

¶ 24 We review the entry of summary judgment *de novo. Kasper v. McGill Management, Inc.*, 2019 IL App (1st) 181204, ¶ 22. Summary judgment is appropriate where "there is no genuine issue as to any material fact and *** the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2012). "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine*

*Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). The party moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The movant may meet the burden either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). To prevail, the nonmoving party must present some evidence that would arguably entitle him to recover at trial. *Kasper*, 2019 IL App (1st) 181204, ¶ 22.

¶ 25    The order on appeal indicates the circuit court granted summary judgment for reasons stated in open court. The record compiled for our review, however, lacks a hearing transcript or one of the acceptable substitutes. We do not know what Bradley intended to argue that day because the record also lacks a complete copy of his written opposition to the motion. As the appellant, he bore the burden of providing a report of proceedings, a bystander's report, or an agreed statement of facts, as part of a sufficiently complete record to support his claims of error. Ill. S. Ct. Rs. 321 (eff. Feb. 1, 1994) and 323 (eff. July 1, 2017); *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391 (1984); *Beck v. DayOne Pact*, 2023 IL App (1st) 221120, ¶ 29 (when a record is incomplete, the reviewing court may summarily dismiss the appeal or summarily affirm the judgment). In appellate review, we start with the presumption that the ruling conformed with the law and the facts, and the appellant bears the burden of overcoming the presumption. *Foutch*, 99 Ill. 2d at 392; *Beck*, 2023 IL App (1st) 221120, ¶ 29. Doubts that arise from an inadequate record are to be resolved against

the appellant. *Foutch*, 99 Ill. 2d at 392. A transcript and complete copy of Bradley's written response to the motion for summary judgment are not crucial in this appeal, in part because his motion to reconsider, the transcript of the reconsideration hearing, and the defendants' appellate brief fill in the gaps of information. In addition, under the *de novo* standard applicable to summary judgment rulings, we are performing the same analysis that the circuit court would perform and we are reviewing the judgment, not the circuit court's reasoning. *Beck*, 2023 IL App (1st) 221120, ¶ 29. This is an instance when the appeal can be resolved on the merits, despite the appellant's disregard for the rules.

¶ 26 Based on our *de novo* review, Count I fails on its merits because Bradley did not raise an issue of material fact about the elements of a breach of contract action. To recover for breach of contract, the plaintiff must establish: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff. *Greggs USA, Inc. v. 400 E. Professional Associates, LP*, 2021 IL App (1st) 200959, ¶ 12. Bradley vacillated between alleging an oral or written contract. The record leading up to the summary judgment ruling is incomplete, but during the reconsideration hearing, he committed to the written format. The circuit court asked Bradley to "be very clear on the record what you're alleging" and said, "So your theory is a written contract. You're not going forward on an oral contract theory; is that correct?" Bradley responded, "That is correct."

¶ 27 Ordinarily, one of the acts that forms a written contract is that the parties affix their signatures. *Hedlund & Hanley, LLC v. Board of Trustees of Community College District No. 508*, 376 Ill. App. 3d 200, 205-06 (2007). Signing demonstrates mutuality or assent. *Id*. at 206. "[I]f a written contract by its terms is drafted as a mutual agreement among several parties, it must be

signed by all parties in order to bind them, or it will not bind any party because the contract will remain uncompleted." *Crum v. Krol*, 99 Ill. App. 3d 651, 655 (1981). Here, neither side signed the original version of the written contract that Bradley proposed in March 2022, and only Bradley signed the revised version that Jubeh swore was not the parties' contract and was proposed for the first time in August 2022. The unsigned or partially-signed documents did not establish the existence of a valid and enforceable contract.

¶ 28    It is possible to form a binding written contract without signatures, if the parties show their mutuality or assent through their acts or conduct. *Hedlund*, 376 Ill. App. 3d at 206. In *Hedlund*, for instance, a law firm's letter that included fee terms was supposed to be signed and returned by the defendant, but the defendant never sent it back. *Id*. For the next four years, the law firm invoiced the defendant according to the fee schedule and the defendant paid the invoices. *Id*. The defendant's acts manifested that the letter was an express, binding agreement. *Id*. A party in *Wilda* contended that it never received the second page of an equipment rental agreement and had not assented to its terms. *Wilda v. JLG Industries, Inc.*, 470 F. Supp. 3d 770, 799 (N.D. Ill. 2020). Another party argued that receiving and paying for use of the rental equipment were indications of assent. *Id*. The court disagreed, reasoning that "payment may be evidence that a contract existed, but it says nothing about the terms of the contract." (Emphasis omitted.) *Id*. Similarly, here, the campaign committee's receipt and payment for Bradley's services may be evidence that *a* contract existed, but it does not indicate that it was an oral contract only for the primary election period as the defendants contended or a written contract for both the primary and general election periods as Bradley contended. However, a comparison of the parties' acts or conduct during the primary election campaign with their behavior during the general election campaign is revealing. Neither

side's acts or conducts after the primary election demonstrated assent to the terms in either version of Bradley's written contract.

¶ 29    Bradley admitted that the candidate, campaign manager, or senior campaign staff would have been "dictat[ing]" his "work and messaging" as a campaign professional. The record shows that after the primary, the defendants no longer included Bradley in their campaign activities, responded to his e-mails, or paid him. The defendants' conduct is consistent with having an oral contract that covered only the primary, but it did not manifest assent to contracting with Bradley for the general election period.

¶ 30    Bradley's actions or inactions also changed considerably after the primary election, and he himself did not act like there was a contract that covered the general election cycle. There was a change in the content and tenor of Bradley's e-mails. Where he had previously proposed specific advertisements or interviews that he thought would advance Giannoulias' campaign for the primary election, Bradley no longer brainstormed for the candidate. Instead, Bradley communicated only twice. On July 12th, just days after the primary, he sent Jubeh the Chicago Tribune article about a "former campaign strategist" who sued the candidate. He emphasized the article's statement that "politicians don't want a reputation for not paying" and wrote, "Food for thought. Let's meet (me, you and Alexi) as soon as possible." On August 1st, Bradley sent a solicitous e-mail to multiple people "to let you know that Governor JB and Alexi Giannoulias need [Bradley] more than they could ever imagine." Threatening to embarrass Giannoulias amid the general election campaign and soliciting employment during the general election campaign were not manifestations of having a contract that would endure for another three or four months. The communication was, however, consistent with Jubeh and Patitucci's affidavits indicating that on

April 12th Bradley was informed and acknowledged that consultants for the general election period would not be hired until after the primary election took place on June 28th, that no agreement was reached beyond the primary election, and that Bradley had not been rehired. Bradley's conduct after the primary also supports the defendants' contention that "[t]his action is an attempt to embarrass public figures and extract money from them and has no basis in law or fact."

¶ 31    This record does not demonstrate a question of material fact as to whether there was an unsigned but effective contract that covered the months between the primary election and the general election.

¶ 32    Bradley also failed to create a material fact regarding the second element of a breach of contract action, which is that he performed the contract. *Greggs USA*, 2021 IL App (1st) 200959, ¶ 12. His written response to the motion for summary judgment, albeit an incomplete copy, does not address the defendants' argument that Bradley ceased providing services after the primary. Furthermore, the circuit court remarked during the reconsideration hearing that "we went through this over and over and over again" and that Bradley had no evidence that he performed any service. Nothing in the record refutes the circuit court's observation.

¶ 33    Despite clearly committing in the circuit court to a written contract, on appeal, Bradley contends that his theory all along has been an oral contract. Also, despite alleging in his amended complaint that he "diligently performed *** services pursuant to the contract," he pivots to the first-to-breach rule that he raised for the first time in his motion to reconsider.

¶ 34    Late factual or legal arguments are met with significant suspicion. *Caisse Nationale de Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996). A party opposing summary judgment "is required to 'wheel out all its artillery to defeat it' " and cannot withhold

critical arguments for later use. *Id*. A motion to reconsider is not a vehicle to raise a factual argument or legal theory that could have been heard during the pendency of the previous motion (*Liceaga v. Baez*, 2019 IL App (1st) 181170, ¶ 25), or to rehash previously rejected arguments. *Caisse Nationale*, 90 F.3d at 1270. "Actions like that simply waste everyone's time and money[.]" *Liceaga*, 2019 IL App (1st) 181170, ¶ 28. The purpose of a motion to reconsider is to bring the circuit court's attention to changes in the law, errors in the court's previous application of existing law, or newly discovered evidence that was not available at the time of the hearing. *Kaiser v. MEPC American Properties, Inc.,* 164 Ill. App. 3d 978, 987 (1987). New factual arguments and legal theories not previously made are subject to waiver. *Liceaga*, 2019 IL App (1st) 181170, ¶ 25. The circuit court, nevertheless, gave Bradley's motion a full hearing and then denied it. Where a reconsideration motion "was based on new matters, such as additional facts or new arguments or legal theories not presented during the course of the proceedings leading to the order being challenged, the abuse-of-discretion standard applies." *Id.* at ¶ 26. "[A] trial court is well within its discretion to deny such a motion [to reconsider] and ignore its contents when it contains material that was available prior to the hearing at issue but never presented." (Internal quotations omitted.) *Id*. at ¶ 27.

¶ 35    Bradley argues that the circuit court erroneously granted summary judgment because it "ignored" the first-to-breach rule set out in *PML Development LLC v. Village of Hawthorn Woods*, 2023 IL 128770, ¶ 50. The circuit court did not "ignore" a rule which Bradley would introduce only later in the litigation and the court was under no obligation to interject arguments into the proceedings.

¶ 36    The first-to-breach rule excuses the injured party from future performance and allows that

party to pursue breach of contract claims. To prevail on this theory, Bradley would need to create a material question of fact regarding his breach of contract action. We found above that he failed to raise a material question of fact as to whether there was a contract covering the months between the primary election and the general election. It was not an abuse of discretion for the circuit court to reject Bradley's late and misplaced reliance on the first-to-breach rule.

¶ 37     Thus, Bradley not only waived appellate review by failing to provide an adequate record to support his claims of error, he has also failed to persuade us that the circuit court erred with respect to Count I.

¶ 38     As for Count II, *quantum meruit* is a legal theory that is routinely plead as an alternative to breach of contract claims, and the two types of claims are mutually exclusive. *Finn v. Project Resource Solutions, LLC*, 2024 IL App (1st) 221016, ¶ 49. "To recover under *quantum meruit*, the plaintiff must prove (1) the plaintiff performed a service to benefit the defendant, (2) the plaintiff did not perform this service gratuitously, (3) the defendant accepted this service, and (4) no contract existed to prescribe payment for this service." *Kane v. Option Care Enterprises, Inc.*, 2021 IL App (1st) 200666, ¶ 40. Bradley does not argue that he performed a service during the general election period or could meet any of the other elements of a *quantum meruit* claim. His sole appellate argument is the first-to-breach rule that may be applicable to contract actions. He has forfeited review of Count II by failing to brief it. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (points not argued in an opening appellate brief are waived).

¶ 39     For all these reasons, the summary judgment ruling against Bradley and in favor of the defendants is affirmed.

¶ 40     Affirmed.