A.O. SMITH CORPORATION, Plaintiff and Counterdefendant-Appellant, v. KAUFMAN GRAIN COMPANY *et al.*, Defendants and Counterplaintiffs-Appellees.

Third District   No. 3—91—0540

Opinion filed May 18, 1992.—Modified on denial of rehearing July 31, 1992.

Keck, Mahin & Cate, of Peoria (J. Reed Roesler, of counsel), for appellant.

Blanke, Norden, Barmann, Kramer & Bohlen, P.C., of Kankakee (Christopher W. Bohlen, of counsel), for appellees.

JUSTICE GORMAN delivered the opinion of the court:

This case arises from a landlord-tenant dispute. The landlord seeks unpaid rent and recovery for damage to the leased premises. The tenant counterclaimed for damage to property that it had stored at the premises. A bench trial was held and the court found that the tenant was entitled to damages in the amount of $306,558.61 on its counterclaim. This amount was offset by a judgment in favor of the landlord for $1,600 for damage to the warehouse. It is from this order that the landlord appeals.

Kaufman Grain Company operates a grain elevator business in Kankakee. For purposes of this litigation, the position of Kaufman Grain and Kaufman, Inc., is the same. Accordingly, they will be collectively referred to as "Kaufman Grain" or "tenant."

In 1986, due to an exceptionally good harvest, Kaufman Grain needed additional grain storage space. Through a local realtor, Kaufman Grain contacted the A.O. Smith Corporation.

A.O. Smith operated a large manufacturing complex in Kankakee. It built water heaters in part of this facility. The completed units were then stored in cardboard cartons in an adjacent warehouse. A.O. Smith was in the process of relocating its manufacturing plant and so was interested in selling or leasing the empty buildings.

Calvin Kaufman and Kevin Kaufman, Kaufman Grain's principals, visited the warehouse. At that time, it was still being used to store water heaters and only a small part had actually been emptied. The two men spent about one half of an hour walking through the building to determine if it would be suitable for grain storage. Sometime later, they returned and drove a semi-truck through the building to insure that grain trucks could be maneuvered through its interior.

On September 27, 1986, A.O. Smith and Kaufman Grain entered into a one-year lease agreement, with an option for a second year. The lease provided, in pertinent part:

"4. EXPENSES *** Tenant shall pay all other expenses of the Property. Such expenses include the cost of operating and maintaining the Property, including without limitation, adequate pest protection, snow removal, security, utilities, fire protection systems, landscaping, rubbish removal, foundations, walls, roofs, streets, rail tracks and switches. Notwithstanding the above, the Landlord shall repair any roof leaks up to an aggregate cost of $25,000 ***.

* * *

6. REPAIR. By taking possession, Tenant accepts the Premises as being in good order and repair, and in the condition which the Landlord is obligated to deliver the premises. Tenant shall maintain the Premises and the surrounding real estate, promptly making all necessary repairs and replacements, whether ordinary or extraordinary ***."

Kaufman Grain took possession on September 29 and literally began moving in grain while A.O. Smith was moving water heaters out. Over the next six weeks, Kaufman Grain brought in over 1.4 million bushels of corn and over one-quarter million bushels of soybeans.

In October of 1986, Kevin Kaufman noticed a number of pinholes in the roof at the west end of the building. When notified, A.O. Smith repaired the roof at its own expense.

In November, a downspout was found to be leaking along the north perimeter. The roof's drainage system consisted of a series of downspouts, some of which ran through the interior of the building along structural beams. Water was channeled through these downspouts into a drain tile beneath the building's floor. A.O. Smith also repaired this leak.

In December of 1986 and then again in January of 1987, other leaky downspouts were discovered. Sometime in mid-January, Kevin Kaufman climbed onto the roof and plugged the holes in the gutters which served the downspouts extending through the building's interior. This, for the most part, ended the roof/downspout problem. Kaufman Grain did report one more leak in June of 1987 and A.O. Smith repaired it.

The grain was also subjected to another source of water which caused damage. The warehouse contained a sprinkler system. The lease provided that:

"In maintaining its own building insurance, Tenant, with its insurer's written permission and acknowledgment to Landlord, may shut off the sprinkler system in the Premises."

Pursuant to this provision, A.O. Smith, at Kaufman Grain's request, shut off the sprinkler system at the valve houses. Because the building was unheated, these valve houses were equipped with heating devices to assure that the valves would not freeze.

During the course of the lease period, Kaufman Grain shut off several of the warehouse's electrical circuits. This cut off the electricity to the valve houses, thus deactivating the heating devices. As a result, a valve froze causing a pipe to burst and leak water onto the grain in February of 1987. A.O. Smith repaired that valve.

Despite these ongoing problems, Kaufman Grain exercised its option in February of 1987 and extended the lease through October 30, 1988.

Relations between the two parties deteriorated. In late 1987, A.O. Smith briefly locked Kaufman Grain out in a dispute over the alterations Kevin Kaufman had made to the roof's drainage system.

In November of 1987, Kaufman Grain ran a separate electrical service into the building, as had been contemplated in the lease. Kaufman Grain then cut off all electrical circuits in the building and activated only enough of its own lines to run the aeration fans.

In January of 1988, a second sprinkler valve froze. Another pipe burst, which left the beans standing in two feet of water. The valve was not subsequently repaired, but A.O. Smith shut off the water supply at a remote location.

On March 2, 1988, A.O. Smith filed a forcible entry and detainer action. The parties subsequently stipulated that the lease would terminate on June 1, 1988, even though it was scheduled to run through October 30, 1988. The circuit court entered an order on this stipulation, granting possession to A.O. Smith effective June 1, 1988. Kaufman Grain, however, did not actually vacate until February 4, 1989. Further, it stopped making rent payments after July 1988.

A.O. Smith eventually filed an amended complaint, seeking to recover for unpaid rent and for damage to the leased building. Kaufman Grain filed a three-count counterclaim, seeking recovery for damage to the grain and additional expenses incurred as a result of the water damage. A.O. Smith answered, setting up an affirmative defense against two of the counts. A.O. Smith claimed that count II failed to state a cause of action. It further averred that, under count III, there was no duty to reveal latent defects which a reasonable examination would reveal. A third affirmative defense, failure to mitigate damages, was later added.

The trial court found in favor of Kaufman Grain on its counter-claim and in favor of A.O. Smith on its claim for damage to leased premises. The trial court rejected A.O. Smith's claim for unpaid rent.

On appeal, the first issue is whether A.O. Smith had a duty to provide a dry building, or at a minimum, to disclose alleged latent defects.

■ In Illinois, the general rule is that, apart from the lease, there is no duty on the landlord to maintain the premises or repair the roof. (*Zion Industries, Inc. v. Loy* (1977), 46 Ill. App. 3d 902, 361 N.E.2d 605.) As a result, the landlord is not liable for injury to the property of a tenant caused by defects in the demised premises absent an express warranty as to the condition of the premises or a covenant to repair. (*Wanland v. Beavers* (1985), 130 Ill. App. 3d 731, 474 N.E.2d 1327.) Moreover, on a lease of premises to be used for a specific purpose, there is no implied covenant that the premises are fit for that purpose. *Eskin v. Freedman* (1964), 53 Ill. App. 2d 144, 203 N.E.2d 24.

■ Thus, the doctrine of *caveat emptor* is generally applicable to lease agreements. (*Wanland*, 130 Ill. App. 3d at 732, 474 N.E.2d at 1328.) The duty to inspect the premises and determine their safety and suitability falls on the tenant. *Greenlee v. First National Bank* (1988), 175 Ill. App. 3d 236, 529 N.E.2d 723.

Accordingly, we must first look to the lease to determine whether A.O. Smith has assumed any duty to repair the roof, and if so, whether it breached that duty.

Kaufman Grain points to A.O. Smith's obligation to repair any roof leaks up to an aggregate cost of $25,000. This clause, according to the tenant, confers a duty to repair on A.O. Smith and makes the landlord liable for the resulting damage. Kaufman Grain also argues that since the landlord knew of the intended use, it assumed a duty to provide a dry building.

■ There is nothing in the lease whereby A.O. Smith expressly warrants the conditions of the building. Additionally, there is no express general covenant to repair. To the contrary, the lease provides that the tenant shall make all repairs, ordinary and extraordinary.

We therefore disagree with the trial court's finding that A.O. Smith had an obligation to provide a dry building. A.O. Smith's knowledge of the intended use is irrelevant to this issue. As noted above, on a lease of premises to be used for a specific purpose, there is no implied covenant that the premises are fit for that purpose. *Eskin v. Freedman* (1964), 53 Ill. App. 2d 144, 203 N.E.2d 24.

The record also shows that A.O. Smith repaired the roof and the downspouts each time it was notified of a specific problem. The record does not show that A.O. Smith was negligent in these repairs. None of the downspouts which the landlord replaced caused any further problems. Therefore, A.O. Smith has satisfied its duty to repair under the lease.

Alternatively, Kaufman Grain claims that A.O. Smith knew or should have known of the problems with the downspouts and failed to disclose them. A.O. Smith argues that these defects were not known, and even if they were, Kaufman failed to make a reasonable examination of the premises.

■ It is generally the tenant's duty to inspect the premises to determine their safety and suitability. (*Greenlee v. First National Bank* (1988), 175 Ill. App. 3d 236, 529 N.E.2d 723.) Where a lease contains a clause making the lessee generally responsible for repairs, the expense of repairing subsequently discovered defects falls upon the lessee. *Mandelke v. International House of Pancakes, Inc.* (1985), 131 Ill. App. 3d 1076, 477 N.E.2d 9.

An exception to this rule exists where the landlord knows or should know of a latent defect and where the defect could not have been discovered upon a reasonable examination of the premises by the tenant, the landlord will be held liable for damage to the property of the tenant occasioned by the latent defect. *Wanland*, 130 Ill. App. 3d at 732, 474 N.E.2d at 1328.

Initially, we note that A.O. Smith had no duty to disclose the pinholes in the roof. These are not alleged to have contributed to the grain's damage and are thus immaterial to the case at hand.

As to the downspouts, A.O. Smith was aware that there had been prior problems with some of the downspouts and had replaced them on an as-needed basis. There is no evidence that A.O. Smith was aware of any problems with any of the existing downspouts. Kaufman Grain concedes that none of the replaced downspouts caused any damage.

■ We find that these alleged defects are not the type which would justify an exception to the general rule. Kaufman Grain had experience in the grain storage business and knew what type of facility would be required and had inspected the warehouse. It knew these facilities had not been designed for grain storage. Nevertheless, it rented the warehouse, accepting it basically "as is." Therefore, A.O. Smith is not liable for failing to disclose.

The next claimed source of damage to the grain came from the bursting sprinkler pipes. The trial court accepted Kaufman Grain's ar-

gument that the lease imposed a duty on the landlord to disable the sprinkler system. It reasoned that Smith knew how the system functioned and was in the best position to prevent the problem.

This argument, however, contradicts the express language of the lease which makes it the tenant's duty to maintain and repair the sprinkler system. The tenant also was given the right to disconnect the system, should it so desire. Moreover, Kaufman Grain leased the entire building and exerted complete control over it, even to the point of rewiring it. There is nothing in the lease which would give rise to a duty on the part of A.O. Smith to insure that the sprinkler system would not cause damage to the stored grain.

Nevertheless, despite the lack of a duty, A.O. Smith did undertake to turn off the system. By so doing, it assumed a duty to carry out the task in a nonnegligent manner.

A.O. Smith disabled the fire protection system by turning it off at the valve houses. After the sprinkler burst, the system was turned off at a remote location. Kaufman Grain alleges that A.O. Smith should have disconnected the system at the remote location initially and drained the pipes. Had that been done, there would have been no water in the pipes and they would not have frozen and burst.

■ We hold that even though A.O. Smith did not have a duty under the lease, it assumed that duty by attempting to disable the sprinkler system. The question then becomes whether it was reasonable for a person in A.O. Smith's position to have merely disconnected the system at the valves.

A.O. Smith knew that Kaufman Grain needed a dry building. A.O. Smith also knew that Kaufman Grain intended to do extensive rewiring which might affect the existing fixtures, including the heating devices for the valves. Based on this knowledge, a reasonable person in A.O. Smith's position would have disconnected the system at a remote point and drained the pipes. We therefore find that A.O. Smith breached its duty by not turning off the system at a remote location which would have prevented any water from entering the building. As a result of this negligence, the pipes burst, causing damage to the stored grain. A.O. Smith is liable for the damage caused by the bursting pipes.

Our review of the record fails to reveal what percentage of the damage is attributable to the burst pipes as opposed to the problems with the roof and downspouts. Accordingly, we vacate the judgment in favor of Kaufman Grain and remand this issue so that Kaufman Grain can prove what portion of the damages is a result of the broken sprinkler pipes.

The final issue is whether A.O. Smith is entitled to recover unpaid rent. The lease was scheduled to expire by its own terms on October 30, 1988. Due to the problems, the parties stipulated that it would end June 1, 1988, and the trial court entered an order granting A.O. Smith possession as of that date. Kaufman Grain did not vacate at that time but did pay rent for June and July. It then ceased paying rent but did not actually vacate until after February 4, 1989. The trial court found that the holdover was caused by A.O. Smith's conduct and denied recovery.

■ The general rule is that the obligation to pay rent and the covenant to make repairs are separate and independent covenants and that the failure to make promised repairs does not discharge the obligation to pay rent. (*Poulos v. Reda* (1987), 165 Ill. App. 3d 793, 520 N.E.2d 816.) It is equally well established that the obligation to pay rent is dispensed where the landlord evicts the tenant. (*Zion Industries, Inc. v. Loy* (1977), 46 Ill. App. 3d 902, 361 N.E.2d 605.) Such an eviction can be total, partial or constructive.

Here, Kaufman Grain made no claim that it was evicted. Even if such a claim were made, it would fail because Kaufman Grain remained in possession of the premises. As long as the tenant continues to occupy the premises, the obligation to pay rent is not suspended. *Zion Industries*, 46 Ill. App. 3d at 908, 361 N.E.2d at 609.

Nor has Kaufman Grain made any claim that the rental value of the property was decreased by the problems. (*Cf. 64 East Walton, Inc. v. Chicago Title & Trust Co.* (1979), 69 Ill. App. 3d 635, 387 N.E.2d 751.) If it had, the proper remedy would have been to continue paying rent and sue for damages. That was not done.

Kaufman Grain is therefore liable for unpaid rent which accrued from August 1, 1988, through February 4, 1989. The resulting question is the amount owed.

■ Under Illinois law, a tenant who remains in possession after his lease expires becomes a tenant at sufferance. (*General Parking Corp. v. Kimmel* (1979), 79 Ill. App. 3d 883, 398 N.E.2d 1104.) At the sole option of the landlord, a tenant at sufferance may be evicted as a trespasser or treated as a holdover tenant. (*Brach v. Amoco Oil Co.* (N.D. Ill. 1983), 570 F. Supp. 1437.) A holdover tenancy is created when a landlord elects to treat a tenant, after the expiration of his lease, as tenant for another term upon the same provisions contained in the original lease. (*Bismarck Hotel Co. v. Sutherland* (1980), 92 Ill. App. 3d 167, 415 N.E.2d 517.) While the landlord's acceptance of rent for the month following the expiration of the lease may by itself indicate the landlord's election to treat the tenant as a holdover, other

facts and circumstances bearing on the landlord's intent should be considered as well. *Bismarck Hotel,* 92 Ill. App. 3d at 171, 415 N.E.2d at 520.

Here, it was clearly not A.O. Smith's intent to bind Kaufman Grain to another year's term. In fact, A.O. Smith does not even make such a claim. Thus, there is no holdover tenancy.

Nevertheless, even when a holdover tenancy is not shown, the conduct of the parties can create a month-to-month tenancy. Acceptance of monthly rental payments by the landlord will generally create a month-to-month tenancy. (*Dobsons, Inc. v. Oak Park National Bank* (1980), 86 Ill. App. 3d 200, 407 N.E.2d 1107.) A month-to-month tenancy is similar to a holdover tenancy in that both are governed by the terms of the original lease. The difference lies in the duration. A holdover tenancy will last as long as the original lease term. A month-to-month tenancy can last indefinitely, but can be terminated on 30 days' notice.

■■ The original lease terminated by stipulation on June 1, 1988. Kaufman Grain remained in possession thereafter and paid rent for June and July. A.O. Smith accepted these payments. Thus a month-to-month tenancy was created and A.O. Smith is entitled to rental payments for this period.

The monthly rent on the building was $19,894. In addition to this amount, A.O. Smith seeks interest on the past-due payments at a rate of 2% per month from the due date.

Prejudgment interest is not recoverable absent a statute or agreement of the parties providing for it. (*Richman v. Chicago Bears Football Club, Inc.* (1984), 127 Ill. App. 3d 75, 468 N.E.2d 487.) Here, the lease expressly provides for a 2% interest rate on all past-due amounts. Since the month-to-month tenancy is governed by the terms of the prior lease, A.O. Smith is entitled to recover this amount. We find that the interest due should be calculated from the date each payment was due, and should cease to accrue on May 10, 1991, the date judgment was entered in the circuit court.

■■ A.O. Smith further contends that it is entitled to 200% of the rent due for all dates after October 30, 1988. The lease provided that the tenant shall pay that amount for each day the tenant remained in possession after the termination date. Since the lease would have terminated under its own terms on October 30th, A.O. Smith argues that the 200% holdover provision comes into effect as of that date. This lease provision is in accord with the forcible entry and detainer statute, which also allows for the collection of double rent upon a willful holdover. Ill. Rev. Stat. 1989, ch. 110, par. 9—202.

We decline, however, to apply this clause. In October of 1988, A.O. Smith attempted to execute on its judgment of possession. Kaufman Grain moved for and received a temporary injunction, barring A.O. Smith from taking possession. The trial court found that a month-to-month tenancy had been created by the actions of the parties.

After the trial court denied A.O. Smith's motion to vacate the injunction, A.O. Smith filed a notice of appeal with this court. That appeal was ultimately dismissed by the appellant without a ruling by this court. Therefore, the trial court's finding of a month-to-month tenancy becomes the law of the case and A.O. Smith cannot now challenge that ruling. (*Wolfe v. Illini Federal Savings & Loan Association* (1987), 158 Ill. App. 3d 321, 511 N.E.2d 828; *Emerson Electric Co. v. Sherman* (1986), 150 Ill. App. 3d 832, 502 N.E.2d 414.) There is nothing to indicate that the relationship between the parties changed from that point through the time when Kaufman Grain vacated the premises. As a result, the month-to-month tenancy was not severed and the holdover provision never came into play.

Therefore, even though the landlord is not entitled to double rent, it is entitled to the normal monthly rent for this period. The record reveals that Kaufman Grain initially paid a $10,000 security deposit, which A.O. Smith still retains. Crediting that amount against the August 1988 rent, our calculations show that the amount owed, including simple interest at 2% per month through the date of judgment, is $180,557.71. Accordingly, we enter judgment in favor of A.O. Smith in that amount.

In summary, we vacate the trial court's entry of judgment of $306,558.61 in favor of Kaufman Grain on its claim for damage to the stored grain and remand for a determination of what percentage was caused by the broken pipes. We affirm the trial court's entry of judgment of $1,600 in favor of A.O. Smith for damage to the leased facilities. We reverse the trial court's ruling on the unpaid rent and enter judgment in favor of A.O. Smith in the amount of $180,557.71.

Affirmed in part; reversed in part; vacated in part and remanded.

SLATER and HAASE, JJ., concur.