2021 IL App (2d) 200604-U
No. 2-20-0604
Order filed September 29, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| MIDWEST MASONRY, INC., | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellee, | ) | |
| and Cross-Appellant | ) | |
| | ) | |
| v. | ) | No. 15-LM-23 |
| | ) | |
| CENTRAL IRRIGATION SUPPLY, INC., | ) | |
| | ) | Honorable |
| Defendant-Appellant, | ) | Michael B. Betar, |
| and Cross-Appellee | ) | Judge, Presiding |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant failed to provide this court with a full record regarding the trial court's discretionary denial of its motion for sanctions against plaintiff pursuant to Illinois Supreme Court Rule 137. The trial court did not abuse its discretion in allowing Midwest to present a fee petition following the close of its case-in-chief. The trial court's finding that Plaintiff intended to treat defendant's holdover tenancy as a one-year renewal of the lease of the lease agreement at the prevailing rental rate was against the manifest weight of the evidence.

¶ 2    Defendant, Central Irrigation Supply, Inc. ("Central"), appeals the trial court's denial of its

motion to reconsider its October 18, 2019, award of base rent and corresponding late fees to

Midwest Masonry, Inc. ("Midwest"). Central also appeals the trial court's grant of attorney fees and prejudgment interest to Midwest. Midwest counterappeals the trial court's refusal to consider any attorney fees, expenses, and costs incurred after June 14, 2021.

¶ 3                                                      I. BACKGROUND

¶ 4     On March 18, 2011, Midwest and Central entered into a lease agreement. The agreement allowed Central to lease the premises over a four-year period, beginning on April 1, 2011, and ending on April 30, 2014. The lease provided for rent to be paid in monthly installments. During the final year of the lease, Central was to pay Midwest $2708.33 per month. At the conclusion of the lease on April 30, 2014, Central and Midwest were engaged in negotiations related to renewal of the lease. Central remained in possession of the premises throughout these negotiations and continued paying monthly rent of $2708.33, which was accepted by Midwest.

¶ 5     At some point in November 2014, the negotiations between the parties ceased. On November 19, 2014, Central's president, Bernardo Luciano, received a letter from Midwest's counsel. Relevant here, the letter stated:

> "[T]he term of the Lease terminated on April 30, 2014. Since that date, [Central] has retained possession of, and has continued to occupy and use, the premises demised under the Lease *** as a holdover tenant.
>
> As attorney and agent for Midwest, this is to advise you that Midwest hereby exercises its right pursuant to Section 9.7 of the Lease to treat Central's holdover tenancy as a renewal of the Lease for one year, commencing May 1, 2014, and terminating April 30, 2015. Further, pursuant to Section 9.7 of the Lease, the base monthly rental due under the Lease for said one-year renewal period is twice the monthly rental that was in effect

immediately prior to the termination of the term of the Lease in April 2014 (i.e., $2,708.33 X 2 = $5,416.66/month). ***."

¶ 6     Section 9.7 of the parties' lease agreement states:

"Tenant will, at the termination of this Lease by lapse of time or otherwise, yield up immediate possession to Landlord.  If Tenant retains possession of the Premises or any part thereof after such termination, then Landlord may, at its option at any time thereafter, serve written notice upon Tenant that such holdover constitutes any one of: (a) renewal of the Lease for one year at the then prevailing current rental rate; or (b) creation of a month to month tenancy upon the terms and conditions set forth in this Lease; or (c) creation of a tenancy at sufferance in any case upon the terms and conditions set forth in this Lease;

PROVIDED, HOWEVER, that the monthly rental (or daily rental under (c)) shall, in addition to all other sums which are to be paid by Tenant hereunder, be equal to double the rental being paid monthly by Tenant under this Lease immediately prior to such termination ***."

¶ 7     On December 15, 2014, Midwest served Central with Five Day Notice of Default pursuant to section 9-209 of the Illinois Forcible Entry and Detainer Act (the Act).  The Notice stated that Central was delinquent in its payment of rent in the amount of $31,416.63.  This amount included $2,708.33 for failure to pay the double rent for each month from May 2014 through December 2014, as well as $9,749.99 in late fees.

¶ 8     On January 6, 2015, Midwest filed a verified complaint for possession and damages against Central.  The complaint sought $31,416.63 in unpaid rent and late fees related to Central's failure to pay double rent from May 2014 through December 2014.  The complaint did not allege that Central was obligated to pay rent for the months of January 2015 through April 2015.

¶ 9     Following Central's failure to appear on January 26, 2015, the trial court entered a default judgment against it in the amount of $24,581.30, and found that Central had surrendered possession of the premises.  On March 13, 2015, Central filed a petition to vacate judgment pursuant to section 2-1401 of the Illinois Code of the Civil Procedure.  735 ILCS 5/2-1401 (West 2012).  The trial court ultimately denied Central's petition to vacate default judgment, finding that Central did not act with due diligence. On appeal, this court reversed the trial court's denial of Central's 2-1401 petition and vacated the default judgment before remanding the matter back to the trial court. See *Midwest Masonry, Inc., v. Central Irrigation Supply, Inc.*, 2016 IL App (2d) 150576-U.

¶ 10    Upon remand, Central filed a motion to dismiss Midwest's verified complaint for possession and damages. Midwest was granted leave to file an amended complaint. On March 8, 2018, Midwest filed a verified amended complaint for damages alleging that Central abandoned the premises after receiving the November 19, 2014, letter from Midwest's counsel. The amended complaint further alleged that, despite its best efforts, Midwest was unable to lease the premises to a new tenant until May 2015. Midwest's prayer for relief reasserted that it was entitled to $2708.33 for Central's failure to pay double rent for the months of May 2014 through December 2014, and further sought double rent payments for January 2015 through April 2015, plus late fees. Midwest also sought attorneys fees through the amended complaint.

¶ 11    The matter proceeded to a bench trial on October 18, 2019. Midwest called its president and only witness, Frank Dziadus, to testify. He testified that he spoke with Mike Hoffman, the manager at the leased premises, sometime in July 2014 regarding the expiration of the lease in April 2014. Dziadus said it was his intention at that time to get a five-year extension and Hoffman requested that he send a proposal. On July 31, 2014, Dziadus's secretary, Bridget Austin, sent

Hoffman a five-year lease extension proposal letter. Approximately three weeks later, Hoffman responded via email that he was interested in a three-year lease at a lesser amount of money than proposed in the five-year extension. Dziadus responded that he would be willing to do a three-year lease, but not for less money. After not hearing back from Hoffman, Dziadus tried catching him when he would come and go from the premises to get an idea of Hoffman's intentions. When he asked Hoffman for a response on the lease, Hoffman "said it's at corporate." Dziadus testified that this exchange went on until November 2014.

¶ 12    Dziadus then stated that he ran into a former employee of Central sometime in early November 2014. He could not recall the person's name. The unnamed person told Dziadus that Central had no intention of renewing the lease. Dziadus then contacted his attorney to discuss options under section 9.7 of the lease agreement. When asked why he didn't have his counsel renew the lease for three or five years in the November 14, 2014, letter to Central, as per the original negotiations, Dziadus indicated that he didn't believe he had the option to do it for multiple years.

¶ 13    Dziadus acknowledged that Central had paid rent at the prevailing rate every month from May 2014 through December 2014. He received an email on December 26, 2014, from Central's controller, Ralph Sepe, stating that Central would vacate the premises on December 29, 2014, and requested a return of Central's security deposit. Midwest informed Central via email that Dziadus was out of town until January 15, 2015, and would inspect the premises upon his return. Central was instructed to drop off the keys to the premises with Bridget Austin at Midwest's office. Midwest regained possession of the premises in January 2015.

¶ 14    On cross-examination Dziadus was presented with his verified answers to Central's affirmative defenses in the matter-at-hand. Based on the answers provided there be Dziadus, he

admitted that Midwest and Central were engaged in negotiations for renewal before the expiration of the lease period. He admitted that at the end of the term of the lease, the parties were still in negotiations regarding a new lease for the premises. Further, Dziadus admitted that Central would continue to possess the premises and make monthly payments of $2708.33 to Midwest after the expiration of the lease term while the parties were negotiating the principal terms of a new lease. Dziadus continued to accept and deposit Central's monthly rent payments at the prevailing rate from May 2014 through November 2014 without making any demand for double rent. The first time double rent was demanded was through the November 19, 2014, letter from Midwest's counsel.

¶ 15    Dziadus acknowledged that Central had kept some pipes and irrigation materials on the side of the building as there was not enough room to store them anywhere else of the premises, but he denied ever discussing additional rental space with Central when negotiating a lease renewal. On December 15, 2014, Dziadus received a piece of Central's marketing mail that indicated Central was moving to a new Mundelein location. Dziadus testified that this upset him, and he had Midwest serve Central with a five-day notice to vacate the premises.

¶ 16    Following the close of Midwest's case-in-chief, Central called Brian Schmitz to testify. Schmitz worked with Dziadus to market the premises in 2014. He recalled Dziadus reaching out to him in October or November 2014 to start actively marketing the premises for rent.

¶ 17    On cross-examination Schmitz stated that a landlord will sometimes list a property during the lease renewal period with the tenant to "kind of give them a little kick, some encouragement, thinking, you know, they're actively listing it."

¶ 18    Central next called Bernardo Luciano, president of Central, to testify. Luciano described ongoing issues at the premises with outside storage space. Central's business requires a location

where a fenced outside yard can be place for storage of pipes that it sells. He directed Mike Hoffman to arrange adequate outdoor storage space at the premises with Dziadus, but it was never accomplished. During the entire period of the lease, the outdoor storage situation was not worked out to Luciano's satisfaction. About a month prior to the expiration of the lease, Luciano directed Hoffman to negotiate the storage issue as part of the lease renewal terms. Luciano stated that adequate outdoor storage was the biggest part of the lease negotiation as Central "can't function with it."

¶ 19    Luciano testified that Central continued occupying the premises after the expiration of the lease as Midwest was trying to identify a spot to put an outdoor fence for Central's storage needs. He never received a notice from Midwest that the continued rent payments were insufficient or that any late fees were being assessed. Luciano said that he never directed Hoffman to attempt to secure a three-year lease for the premises. The proposed lease renewal did not address any of the outdoor storage concerns, and Luciano would not have agreed to an extension without it. In October 2014, after Midwest failed to make an offer to include any outdoor storage in the lease extension, negotiations broke down and Central began looking for a new space to rent.

¶ 20    On cross-examination Luciano admitted that Central did not give notice in writing more than 30 days before January 1, 2015, that it was departing from the premises.

¶ 21    After the close of evidence, the trial court found as follows:

> "Now, the landlord drafted the lease, and one provision of the lease says it's renewed for a year under the prevailing current rental rate, and another section says double the rental rate. So because I cannot determine from the terms of the lease what the intent was, I can look to extrinsic evidence to help me determine what the intent of the parties was.

So now the landlord accepted base rent, not double rent. He accepted base rent from May of [2014] through December of [2014]. He never demanded double rent until November. He never said to the tenant you owe me a late fee, until November, in that attorney's letter.

So I believe the intent of the parties was that it be renewed at the prevailing current rental rate, at the base rent, not the double rent. *** [A]gain, the landlord accepted base rent for several months, never complained about it until the November 19th letter, never said, hey, you owe me a late fee. There was none of that.

So I'm going to award base rent through April 30 of [2015], not double rent, because that's when the one-year renewal terminates, and the only five percent late fee that's due is for January through April of [2015], because that hasn't been paid."

¶ 22    Following its findings, the trial court asked the parties "Is there a fee provision?" Midwest's counsel answered in the affirmative and stated "We'll come in on that later." The trial court advised Midwest's counsel to do so within 30 days. Midwest's counsel then advised the trial court that it was requesting prejudgment interest for the missed rent payments from January 2015 through April 2015, but said it would "come in on a separate motion so we can calculate it."

¶ 23    On November 5, 2019, Midwest filed a post-trial motion for attorneys fees, as well as a motion for award of pre-judgment interest. On January 14, 2020, Central filed a motion to strike both of Midwest's motions. On February 21, 2020, the trial court denied Central's motions to strike.

¶ 24    On March 13, 2020, Central filed a motion for sanctions pursuant to Illinois Supreme Court Rule 137 alleging Midwest filed its original January 6, 2015, verified complaint for possession and damages despite knowing that Central was no longer in possession of the premises and had

tendered possession back to Midwest in December 2014. On June 12, 2020, the trial court denied Central's motion "for the reasons stated on the record."

¶ 25    On June 26, 2020, Central filed a motion to reconsider the trial court's judgment that it was obligated to pay rent to Midwest for the months of January 2015 through April 2015. On August 25, 2020, the trial court denied Central's motion to reconsider and granted Midwest's post-trial motion for attorneys fees, as well as its motion for award of pre-judgment interest.

¶ 26    On September 22, 2020, the trial court issued a final judgment order in favor of Midwest, awarding $11,375 in damages, $3,113.16 in prejudgment interest, $124,698.69 in attorneys fees through June 20, 2020, and $4891.3 in expenses and costs through June 20, 2020.[1]

¶ 27    Central filed this timely appeal.

¶ 28                                      II. ANALYSIS

¶ 29    We begin our analysis with Central's contention that the trial court abused its discretion in denying its motion for sanctions "for the reasons stated on the record". However, Central failed to present this court with a record of the June 12, 2020, hearing in which the trial court stated its reasons on the record as to why Central's motion was denied. Without such a record, this court has no basis to find any abuse of discretion by the trial court on this contention. When we do not know the basis of the court's ruling on a discretionary matter, we must presume that the order was in conformity with the law and had a sufficient factual basis. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984).

---

[1] At the August 21, 2020, hearing on Midwest's post-trial motion for attorneys fees, the trial court stated on the record that it would deny any fees incurred after June 14, 2020, expressing concern that the incursion of fees would otherwise "never end."

¶ 30    Central next contends that the trial court erred in awarding Midwest attorneys fees in its posttrial fee judgment. In its appellate brief, and at oral argument, Central relies on *Lamp, Inc. v. International Fidelity Ins. Co.*, 143 Ill. App. 3d 692 (1986), to support its argument that Midwest waived any claim for attorneys fees and costs after failing to introduce any evidence of such fees before resting its case-in-chief.

¶ 31    Before analyzing Central's argument vis-à-vis Lamp, we must note that matters relating to the order of proof and whether to allow a case to be opened up for taking further evidence rests in the sound judicial discretion of the trial court. *Harper v. Johnson*, 61 Ill. App. 3d 190, 193 (1978).

¶ 32    Returning to Lamp, there a general contractor filed a lawsuit against a subcontractor and the subcontractor's surety, alleging a breach of the subcontract agreement, and that the surety was liable for damages from the breach under its suretyship agreesment. *Lamp*, 143 Ill. App. 3d at 693. The subcontractor's surety filed a counterclaim against the subcontractor seeking indemnity and attorneys fees pursuant to an indemnity agreements. *Id*. at 693. At trial, the surety failed to offer proof of any damages or request at separate hearing. *Id.* at 694. Following trial, the court entered judgment in favor of the subcontractor and found the surety's counterclaim was moot. *Id*.

¶ 33    The surety later moved to modify the trial court's judgment to allow it to recover its attorneys fees incurred in defending the action. *Id*. Alternatively, the surety requested an order that it could seek recovery of its fees in a separate suit. *Id*. The trial court denied the request, stating that the surety had not proved the subcontractor's liability through its counterclaim for failure to offer any evidence of damages at trial. *Id.*

¶ 34    In affirming the trial court's ruling on appeal, this court found that the surety's right to indemnification per the agreement arose immediately upon the general contractor's claim, regardless of the subcontractor's liability under that claim. *Id*. at 695. The surety was required to

offer proof of its damages to support its counterclaim for attorneys fees. *Id.* at 696. Therefore, this court held, "[i]n the absence of a request for a hearing before the close of its proofs or proof of what the evidence concerning costs and fees would show," the trial court did not abuse its discretion in denying the surety's motion to modify the judgment. *Id.* at 697.

¶ 35 Returning to the present appeal, the trial court offered its findings of fact on the record and then asked the parties if there was a fee provision and allowed Midwest's counsel to file a request for attorneys fees within 30 days. Central voiced no objection. The trial court issued an order following bench trial that stated "the court has made its findings of fact and conclusions of law on the record and this matter is continued for entry of judgment on those findings of fact and conclusions of law ***."

¶ 36 Nothing in our reading of Lamp shows that the trial court in the present case abused its discretion in allowing Midwest to present its fee petition following the close of evidence. It is well established in Illinois that the order of proof and the allowing a case to be opened for further evidence rests in the sound discretion of the trial court. *Harper*, 61 Ill. App. 3d at 193. Central's failure to object to the trial court's decision to allow Midwest to seek attorneys fees through a posttrial petition, coupled with the trial court's explicit order reserving entry of final judgment to a date following a hearing on Midwest's fee petition, distinguishes the present case from the facts articulated in *Lamp*. As such, we find the trial court did not abuse its discretion in allowing Midwest to present its petition for attorneys fees following the close of its case-in-chief. However, the actual award of attorneys fees to Midwest is a separate matter entirely.

¶ 37 We now move to Central's contention that the trial court erred in finding it was obligated to pay rent for the premises for the months of January 2015 through April 2015 after Midwest evicted it. Central argues that Midwest's election to evict it from the premises under the Illinois

Forcible Entry and Detainer Act, effectively terminated the lease per the language of section 9-209 of the Act.

¶ 38    Before delving into the arguments presented by Central on this issue, we must note that Midwest stated at oral argument that Central has waived any argument relating to the trial court's finding that the parties intended to create a one-year renewal following the expiration of the original lease period for failure to raise such a contention in its notice of appeal or in its brief presented to this court. Waiver is a limitation of the parties, not the reviewing court. *Central Illinois Public Service Co. v. Allianz Underwriters Ins. Co.*, 244 Ill. App. 3d 709, 713 (1993). "[A] reviewing court does not lack authority to address unbriefed issues and may do so in the appropriate case, *i.e.,* when a clear and obvious error exists in the trial court proceedings." *People v. Givens*, 237 Ill. 2d 311, 325 (2010). Given our standard of review, as articulated below, we may address this unbriefed issue to correct any error made by the trial court that is clear from the record.

¶ 39    Section 9-209 of the Act reads, in pertinent part, as follows:

> "A landlord *** may, any time after rent is due, demand payment thereof and notify the tenant, in writing, that unless payment is made within a time mentioned in such notice, not less than 5 days after service thereof, *the lease will be terminated*. If the tenant does not pay the rent due within the time stated in the notice under this Section, the landlord may consider the lease ended and commence an eviction or ejectment action without further notice or demand." 735 ILCS 5/9-209 (West 2014) (emphasis added.)

¶ 40    Central argues that the Midwest's service of the December 15, 2014, Five Day Notice of Default pursuant to section 9-209 of the Act, coupled with its original suit under the Act to obtain possession of the premises, terminated its rent obligations under the lease agreement per the Act's above emphasized language. We disagree.

¶ 41     Section 10.4 of the parties' lease agreement reads, in pertinent part

>     "If Tenant abandons the Premises *** and Landlord elects to terminate the Tenant's right to possession without terminating the Lease, the Landlord may, at the Landlord's option, enter into the leased Premises *** without such entry and possession terminating the Lease or releasing the Tenant in whole or in part from the Tenant's obligation to pay the rent hereunder for the full term… plus any sums then due hereunder."

In support of its denial of Central's motion to reconsider, the trial court found the above section allowed for Midwest to seek rent payments beyond eviction. To wit:

>     "Section 10.4 of the lease states in relevant part, if tenant abandons the premises, the tenant shall pay to the landlord a sum equal to the entire amount of the rent specified for the residue of the stated term."

¶ 42     A lease is a type of contract and is governed by the rules of contract law. *Crystal Lake Limited Partnership v. Baird & Warner Residential Sales, Inc.*, 2018 IL App (2d) 170714, ¶ 64; *Nebel, Inc. v. Mid-City National Bank of Chicago*, 329 Ill. App. 3d 957, 964 (2002). In construing a lease, the court gives effect to the parties' intentions as expressed in the language of the document when read as a whole. In applying this "four corners rule," a court initially looks to the language of the agreement alone. *River's Edge Homeowners' Ass'n v. City of Naperville,* 353 Ill. App. 3d 874, 878 (2004); *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999). If the language is unambiguous, then the trial court interprets the agreement without resort to parol evidence. *River's Edge*, 353 Ill. App. 3d at 878; *Air Safety*, 185 Ill. 2d at 462. However, if the court finds that the language of the contract is susceptible to more than one meaning, then an ambiguity is present, and parol evidence may be admitted to aid the trier of fact in resolving the ambiguity. *River's Edge,* 353 Ill. App. 3d at 878; *Air Safety*, 185 Ill. 2d at 462-63. Whether language of an

agreement is ambiguous and requires additional evidence for interpretation is a question of law, subject to *de novo* review. *River's Edge,* 353 Ill. App. 3d at 878.

¶ 43    In agreeing with the trial court on its finding as to section 10.4 of the lease, we find *Elliott v. LRSL Enterprises, Inc.*, 226 Ill. App. 3d 724 (1992), instructive. In Elliott, a landlord brought a breach of contract action against his tenant, seeking damages for failure to pay rent. *Elliott*, 226 Ill. App. 3d 726. The lease to the subject premises was for a six-year term commencing July 1, 1987, through June 30, 1993. *Id.* The lease provided, in pertinent part, as follows:

> "REMEDIES NOT EXCLUSIVE—19. The obligation of Lessee to pay the rent reserved hereby during the balance of the term hereof, or during any extension hereof, *shall not be deemed to be waived, released or terminated, * * * by the* service of any five-day notice, other notice to collect, demand for possession, or notice that the tenancy hereby created will be terminated on the date therein named, the *institution of any action of forcible detainer* or ejectment *or any judgment for possession* that may be rendered in such action, *or any other act or acts resulting in the termination of Lessee's right to possession of the Premises.* The Lessor may collect and receive any rent due from Lessee, and payment or receipt thereof shall not waive or affect any such notice, demand, suit or judgment, or in any manner whatsoever waive, affect, change, modify or alter any rights or remedies which Lessor may have by virtue hereof." *Id*.

After failure to pay rent for December and January 1989, landlord filed a suit under the Act seeking possession and past-due rent. *Id.* An agreed order was entered terminating the tenancy on March 31, 1990, and requiring the tenant to pay certain amounts of missed rent. *Id.* at 727. The tenant failed to make the required payment and the landlord was awarded a judgment for the missed payment and a writ of assistance for immediate possession. *Id.*

¶ 44   The landlord subsequently filed a breach of contract action against the tenant seeking damages under the lease for the period of time after the termination of the tenancy on March 31, 1990. *Id.* The tenant argued that the breach of contract action was barred by the disposition of the forcible entry and detainer proceeding by agreed order. *Id.* at 728. The trial court agreed with the tenant and dismissed the action pursuant to section 2-619 of the Code of Civil Procedure. *Id.* at 727.

¶ 45   On appeal, this court reversed the trial court, finding that although the agreed order stated that the tenancy terminated on March 31, 1990, "the order must be interpreted in light of paragraph 19 of the lease, which provides that the lessee's obligation to pay rent is unaffected by any acts resulting in the termination of lessee's right to possession of the premises, including the institution of forcible entry and detainer proceedings or recovery of a judgment for possession." *Id*. at 729. This court went on to find that any remedy provisions contained in the lease must be given effect "unless specifically abrogated by the agreed order." *Id*. at 730. We ultimately held that "termination of a tenancy is a termination of the tenant's right of possession in the property or, put another way, the termination of privity of estate between the landlord and tenant. It is not an adjudication of one's rights under a lease contract and does not terminate the privity of contract between the landlord and tenant when the lease contains a provision to the contrary." *Id*. at 731,

¶ 46   Returning to the present case, Central makes several arguments to what date constitutes the day it was officially evicted from the premises by Midwest. It claims the alleged eviction terminated all Central's rent obligations. Section 10.4 of the lease agreement makes the specific date of eviction (assuming there was an actual eviction), of no event here. Section 10.4 is an unambiguous remedy provision in the lease agreement. Midwest's right to pursue this remedy provision in seeking damages against Central was not abrogated by any prior order contained

- 15 -

within the record presented to this court. Although this court will make no ultimate determination as to whether Central was effectively evicted pursuant to section 2-209 of the Act, the statutory language Central relies on therein does not extinguish its potential liability for future rents when Midwest exercised its remedy provision provided in the lease agreement. As such, we will not disturb the trial court's finding that section 10.4 allowed for Midwest to seek rent payments beyond eviction.

¶ 47    However, reading the lease agreement as a whole, this court takes issue with the trial court's findings as to section 9.7 of the lease agreement. To reiterate, section 9.7 reads as follows:

"Tenant will, at the termination of this Lease by lapse of time or otherwise, yield up immediate possession to Landlord.  If Tenant retains possession of the Premises or any part thereof after such termination, then Landlord may, at its option at any time thereafter, serve written notice upon Tenant that such holdover constitutes any one of: (a) renewal of the Lease for one year at the then prevailing current rental rate; or (b) creation of a month to month tenancy upon the terms and conditions set forth in this Lease ***;

PROVIDED, HOWEVER, that the monthly rental (or daily rental under (c)) shall, in addition to all other sums which are to be paid by Tenant hereunder, be equal to double the rental being paid monthly by Tenant under this Lease immediately prior to such termination ***."

¶ 48    The trial court could not determine from the language of section 9.7 of the lease agreement what the intent was following Central's retention of the premises after April 30, 2014. See *supra* ¶ 21. In its findings on Central's motion to reconsider, the trial court again articulated that it could not "determine from the terms of the lease what the intent" of section 9.7 was. Based on this court's reading of section 9.7, the terms are unambiguous and Midwest's notice to Central through its

counsel's November 19, 2014, letter failed to exercise the provisions of that section.

¶ 49   When Central remained in possession of the premises following the expiration of the original lease term, section 9.7 provided Midwest with the option to send written notice to Central that it was renewing the lease for one year at the prevailing rate of $2708.33. Midwest could also have served Central with written notice that it was creating a month-to-month tenancy at double the prevailing rental rate. Midwest's November 19, 2014, letter exercised neither of these options.

¶ 50   Midwest's written notice said that it "hereby exercises its right pursuant to Section 9.7 of the Lease to treat Central's holdover tenancy as a renewal of the Lease for one year, commencing May 1, 2014, and terminating April 30, 2015.  Further, pursuant to Section 9.7 of the Lease, the base monthly rental due under the Lease for said one-year renewal period is twice the monthly rental that was in effect immediately prior to the termination of the term of the Lease in April 2014 (i.e., $2,708.33 X 2 = $5,416.66/month). ***." As stated above, section 9.7 does not allow for Midwest to exercise such a nonexistent right. Therefore, we need to examine whether the trial court's finding that the parties intended to renew the lease agreement through April 2015 at the prevailing rental rate.

¶ 51   Under Illinois law, a tenant who remains in possession after his lease expires becomes a tenant at sufferance. *A.O. Smith Corp. v. Kaufman Grain Co.*, 231 Ill. App. 3d 390, 398-99 (1992). A holdover tenancy is created when a landlord elects to treat a tenant, after the expiration of his or her lease, as a tenant for another term upon the same provisions contained in the original lease. *Roth v. Dillavou*, 359 Ill. App. 3d 1023, 1027 (2005).  Only the lessor, not the lessee, has the right to decide whether to treat the lessee as a holdover tenant.  *Bransky v. Schmidt Motor Sales, Inc.,* 222 Ill. App. 3d 1056, 1061 (1991).  While the landlord's acceptance of rent for the month following the expiration of the lease may by itself indicate the landlord's election to treat the tenant

as a holdover, other facts and circumstances bearing on the landlord's intent should be considered as well. *A.O. Smith Corp*, 231 Ill. App. 3d at 398-99.

¶ 52     Even when a holdover tenancy is not created, the parties' conduct may create a month-to-month tenancy. *A.O. Smith Corp.,* 231 Ill. App. 3d at 399.  Acceptance of monthly rental payments by the landlord will generally create a month-to-month tenancy. *Id.* at 399; see also *Hoefler v. Erickson,* 331 Ill. App. 577, 584 (1947) ("it is the holding over and paying the same rent, without further agreement, that creates a tenancy from month to month"). Both a holdover tenancy and a month-to-month tenancy are governed by the terms of the original lease. *A.O. Smith Corp.,* 231 Ill. App. 3d at 399.  However, a holdover tenancy lasts as long as the original lease term, while a month-to-month tenancy can last indefinitely, although it can be terminated on 30 days' notice. *Id.*

¶ 53     The trial court's finding that the parties intended to renew the lease to the premises at the prevailing rate for one year is against the manifest weight of the evidence presented. Here, Central remained in possession of the premises after the lease expired and continued to pay Midwest monthly rent in the amount of $2708.33. Midwest accepted these payments as they always had prior to the lease's expiration and raised no objection. From May to December 2014, Midwest accepted Central's monthly rent payments while engaged in ongoing talks to negotiate a new lease. It wasn't until November 19, 2014, that Midwest raised an issue with Central's occupation of the premises.

¶ 54     Neither party was interested in a one-year extension following the expiration of the lease. Frank Dziadus testified that he wanted Central to enter into a five-year extension and Central was interested in a three-year extension, but the parties disagreed as to the monthly rental amount. Further, Dziadus admitted that (1) Midwest and Central were engaged in negotiations for renewal before the expiration of the lease period; (2) the parties were still in negotiations regarding a new

lease for the premises at the end of the term; and (3) Central would continue to possess the premises and make monthly payments of $2708.33 to Midwest after the expiration of the lease term while the parties were negotiating the principal terms of a new lease. Brian Schmitz began marketing the property for Dziadus and Midwest around October 2014, as negotiations between the began to break down. Dziadus's testimony that Central was keeping pipes and irrigation materials on the side of the building, as there was not enough room to store them elsewhere on the premises, supports Bernardo Luciano's testimony that the space was not large enough. It also supports Luciano's testimony that Midwest was trying to identify ways to meet Central's storage needs.

¶ 55    Based on the foregoing, we find that Midwest's acceptance of monthly rent at the prevailing $2708.33 rate from May 2014 through December 2014 while in engaged in negotiations for an extension with Central created a month-to-month tenancy. On December 26, 2014, Central's controller, Ralph Sepe, notified Midwest that Central would vacate the premises on December 29, 2014. Central's obligation to pay rent to Midwest at the prevailing rate extinguished 30 days thereafter. On remand, the trial court shall determine the rental amount, prejudgement interest, fees and costs, if any, associated with this 30-day period.

¶ 56    Our reversal of the trial court's judgment award of Midwest base rent from January 2015 through April 2015 effectively vacates the trial court's award of Midwest's attorney fees, prejudgment interest, and costs and expenses as provided by the lease agreement. Midwest's cross-appeal need not be addressed in this order as the attorneys fees it seeks through reversal of the trial court's denial of fees after June 14, 2020, have been vacated.

¶ 57                               III.CONCLUSION

¶ 58    For the reasons stated, we reverse the trial court's September 22, 2020, judgment order awarding Midwest base rent from January 2015 through April 2015. Further, we vacate the portion

of the September 22, 2020, order awarding attorneys fees, prejudgment interest, and costs and expenses. The matter is remanded to the trial court for further proceedings consistent with this order.

¶ 59    Reversed in part, vacated and remanded in part.